**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | No.   **1:21-cr-84 (PLF)** |
| | ) | |
| **DANIEL PAGE ADAMS** | ) | |

**GOVERNMENT'S OPPOSITION TO**
**DEFENDANT'S APPEAL OF DETENTION ORDER**

The United States respectfully files this memorandum in opposition to the defendant, Daniel Adams's appeal of the detention order in this case. A grand jury of this Court has found probable cause to return an indictment charging Adams with, inter alia, obstructing the U.S. Congress's certification of the results of the 2020 presidential election, in part by assaulting federal law enforcement officers at the U.S. Capitol and then storming that building on January 6, 2021. Adams's statements and actions all demonstrate that there are no conditions of release that would reasonably assure the safety of the community or Adams's compliance with Court orders. For these reasons, the Court should maintain the order that the defendant be detained pending trial.

I.     **Factual Background**

A.  **The Attack at the U.S. Capitol on January 6, 2021**

On January 6, 2021, thousands of rioters stormed the U.S. Capitol Building. The U.S. Capitol, which is located at First Street, SE, in Washington, D.C., is secured 24 hours a day by U.S. Capitol Police. Restrictions around the U.S. Capitol include permanent and temporary security barriers and posts manned by U.S. Capitol Police. Only authorized people with appropriate identification are allowed access inside the U.S. Capitol. On January 6, 2021, the exterior plaza of the U.S. Capitol was closed to members of the public.

On January 6, 2021, a joint session of the United States Congress convened at the U.S. Capitol. During the joint session, elected members of the United States House of Representatives and the United States Senate were meeting in separate chambers of the U.S. Capitol to certify the vote count of the Electoral College of the 2020 Presidential Election, which had taken place on November 3, 2020. The joint session began at approximately 1:00 p.m. Shortly thereafter, by approximately 1:30 p.m., the House and Senate adjourned to separate chambers to resolve a particular objection. Vice President Michael R. Pence was present and presiding, first in the joint session, and then in the Senate chamber.

A large crowd began to gather outside the Capitol perimeter as the Joint Session got underway. Crowd members eventually forced their way through, up, and over Capitol Police barricades and advanced to the building's exterior façade. Capitol Police officers attempted to maintain order and stop the crowd from entering the Capitol building, to which the doors and windows were locked or otherwise secured. Nonetheless, shortly after 2:00 p.m., crowd members forced entry into the Capitol building by breaking windows, ramming open doors, and assaulting Capitol Police officers. Other crowd members encouraged and otherwise assisted the forced entry. The crowd was not lawfully authorized to enter or remain inside the Capitol, and no crowd member submitted to security screenings or weapons checks by Capitol Police or other security officials.

Shortly thereafter, at approximately 2:20 p.m., members of the House and Senate (including Vice President Pence)—who had withdrawn to separate chambers to resolve an objection—were evacuated from their respective chambers. The Joint Session and the entire official proceeding of the Congress was halted while Capitol Police and other law-enforcement officers worked to restore order and clear the Capitol of the unlawful occupants.

Later that night, law enforcement regained control of the Capitol. At approximately 8:00 p.m., the Joint Session reconvened, presided over by Vice President Pence, who had remained hidden within the Capitol building throughout these events.

In the course of these events, approximately 81 members of the Capitol Police and 58 members of the Metropolitan Police Department were assaulted, and one Capitol Police officer died. Additionally, four citizens died; many media members were assaulted and had cameras and other news-gathering equipment destroyed; and the Capitol suffered millions of dollars in damage—including broken windows and doors, graffiti, and residue of various pepper sprays, tear gas, and fire extinguishers deployed both by crowd members who stormed the Capitol and by Capitol Police officers trying to restore order.

**B. Daniel Page Adams Leads a Charge of Rioters Against U.S. Capitol Police Officers and is One of the First to Storm the Capitol Building**

At around 2:00p.m., a large crowd of violent rioters climbed halfway up a flight of exterior stairs to the U.S. Capitol Building. Several U.S. Capitol officers who were in uniform attempted to block the mob of rioters from continuing up the stairs that led directly to the Capitol, using both riot shields and metal barricades. Adams was at the front of the pack, yelling and confronting the officers. Throughout the encounter, Adams filmed everything from his point of view. As can be seen in the screenshot below of the video Adams recorded, little stands between him and the Capitol building besides law enforcement officers and their riot shields.



From the front of the crowd, Adams starts yelling apparently to the rioters around him, "Let's go! Are you ready to push?" At least one individual appears to yell back, "yeah!" Adams then eventually yells, "Let's go! Let's go! Let's go!" and starts pushing against one of the officers in front of him. In the screenshot below of Capitol surveillance footage from January 6, 2021, the defendant is indicated with the red circle, seen at the front of the mob shoving law enforcement officers.



Almost immediately, the sea of rioters around him begin surging forward, and the officers retreat up the stairs. The officers quickly reposition themselves at the top of the stairs, standing with shields and metal barricades. Adams sprints up the stairs and continues yelling, "come on! Let's go! Let's go! Come on! Let's go!" in an apparent effort to encourage the rioters around him to keep pushing forward. At the top, Adams encounters the officers now forming a new blockade to prevent the rush of rioters from reaching the Capitol. At the end of the struggle, Adams successfully breaches the police line, bloodied, and makes his way to the Capitol.

Undeterred, Adams is then one of the first set of rioters to storm the Senate Wing doors of the Capitol building. Upon reaching the Capitol Building, Adams is part of a crowd of rioters, some of whom are breaking windows and opening doors. Blood continuing to trickle down his head, Adams yells, "This is the Capitol building. This is my house! This is my house!" A screenshot of part of the video he continued to record depicts Adams yelling before storming the Capitol.



Less than 40 seconds after the first rioter broke into a window and entered, Adams and his co-defendant, cousin Cody Connell breached the building.

Connell appears to have described the January 6 events detailed above in a social media conversation with another individual on January 7, 2021. Connell stated "4 of us breached the cops blockade and us same 4 breached the Capitol." After apparently sending a video to the same individual, Connell explained, "That's my cousin. When we stormed the cops there was 8 of them and 4 of us so he got clubbed and shot with rubber bullet. But we pushed the cops against the wall, they dropped all their gear and left. That's when we went to doors of Capitol building and breached it."

## II.    <u>Procedural Background</u>

The complaint charged Adams with assaulting a federal law enforcement officer, in violation of 18 U.S.C. § 111 (a felony); obstructing law enforcement engaged in official duties incident to a civil disorder, in violation of 18 U.S.C. § 231(a)(3) (a felony); entering a restricted building without lawful authority, in violation of 18 U.S.C. § 1752(a) (a misdemeanor); and; violent entry on Capitol grounds, in violation of 40 U.S.C. § 5104(e)(2) (a misdemeanor). Adams made his initial appearance in the Eastern District of Texas on January 19, 2021, and the government moved for detention. Adams agreed to waive his right to an identity hearing and requested that his preliminary hearing and detention hearing be held in Washington, D.C.

On February 5, 2021, a federal grand jury in Washington, D.C., indicted Adams on counts of assaulting a federal law enforcement officer, in violation of 18 U.S.C. § 111 (a felony); obstructing law enforcement engaged in official duties incident to a civil disorder, in violation of 18 U.S.C. § 231(a)(3) (a felony); obstructing an official proceeding, in violation of 18 U.S.C. § 1512(c)(2) (a felony); entering a restricted building without lawful authority, in violation of 18 U.S.C. § 1752(a) (a misdemeanor); and; violent entry on Capitol grounds, in violation of 40 U.S.C. § 5104(e)(2) (a misdemeanor).

On February 12, 2021, United States Magistrate Judge Zia M. Faruqui conducted a detention hearing, during which he reviewed the defendant's letters of support and resume and heard the parties' arguments.  In light of the defendant's dangerousness, Judge Faruqui ordered that the defendant be detained pending trial.

## III.    <u>Legal Standard</u>

The defendant styles his pleading as an "appeal of detention order," and so the government, in its response, treats this motion as a "motion for revocation or amendment" of Magistrate Judge

Faruqi's detention order under Section 3145(b). As such, the Court should review the magistrate's detention order *de novo*. *See, e.g.*, *United States v. Tortora*, 922 F.2d 880, 883-84 (1st Cir.1990) (district court engages in *de novo* review of contested pretrial release or detention order made by magistrate).

The Court must consider four factors in determining whether pretrial detention is warranted: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the defendant; (3) the history and characteristics of the defendant; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the defendant's release. 18 U.S.C. § 3142(g). A judicial officer's finding of dangerousness must be supported by clear and convincing evidence. 18 U.S.C. § 3142(f)(2)(b); *United States v. Peralta*, 849 F.2d 625, 626 (D.C. Cir. 1988).

At the detention hearing, the government may present evidence by way of proffer. *United States v. Smith*, 79 F.3d 1208, 1209-10 (D.C. Cir. 1996).

## IV.   <u>Argument</u>

The government submits that it has met its burden of persuasion that pretrial detention is warranted.  An analysis of the four factors heavily weighs in favor of Adams's continued detention given the clear and convincing evidence that his release presents a particular danger to the community.

### A.  The Nature and Circumstance of the Offense Was Dangerous and Serious

During the course of the January 6, 2021, siege of the Capitol, multiple law enforcement officers were assaulted by an enormous mob, which included a number of individuals with weapons, bulletproof vests, and pepper spray who were targeting the officers protecting the Capitol. Adams was one of those individuals that targeted and assaulted law enforcement.

What is particularly troubling about Adams's conduct is the manner in which he assaulted officers and the brazen way he led other rioters to do the same. While he may not have held a weapon, he certainly harnessed one in the sheer number of rioters around him he incited to overcome the officers. At the crest of an enormous number of angry rioters screaming and scaling stairs and walls to the Capitol, Adams looked to the crowd and asked if they were "ready" to charge. Once certain his newfound battalion of rioters was prepared, he began pushing an officer's shield and yelling, "Let's go! Let's go! Let's go!" Sure enough, the other rioters followed Adams's exhortations, and wave after wave of rioters sprinted up the stairs toward the retreating and repositioning officers. Adams's assaultive behavior and encouragement, in part, allowed the large mob of individuals to eventually and successfully overcome the officers and breach the Capitol, putting additional law enforcement officers and Congress members and staff at risk. In short, Adams allowed other rioters to commit multiple criminal acts in and around the Capitol.

Adams not only committed these assaultive acts, but he did so while recording them as if to memorialize the occasion for posterity. While rushing against the officers and encouraging fellow rioters to follow suit, he sometimes looked into the camera. To some officers that day, January 6 was a day of injury and death; to Adams, this was a moment to capture and remember.

When other rioters surged past the officers attempting to block them from the Capitol, they began vandalizing the building and breaking in. Adams joined the crowd and yelled to them, "This is my house! This is my house!" He had breached the Capitol grounds, assaulted officers standing guard, helped hundreds of other rioters reach the building, and had finally reached his destination, claiming it as his own. And he did so undeterred, despite multiple, physical interactions with officers trying to stop him. Indeed, Adams kept going even in the face of his own injuries. Adams's

actions were violent, criminal, and represented an escalated danger amid an already dangerous and unprecedented assault on a democratic institution.

### B.  The Weight of Evidence Against Adams is Strong

Second, the weight of the evidence against Adams is immense: U.S. Capitol surveillance cameras that capture Adams at the front of the mob of rioters, eventually pushing the nearby officers followed by a surge of fellow rioters; videos of Adams's first-person view of his assault and rush on the Capitol; electronic communications between Adams and his co-defendant in the days leading up to January 6, 2021; and surveillance videos showing Adams breach the Capitol Building, holding a smartphone and recording his surroundings. Put simply, the evidence is clear and convincing that Adams presents a danger to the community.

### C.  History and Characteristics of Adams

The defendant is known to possess firearms, and law enforcement discovered a number of them throughout his residence during the execution of a lawfully obtained search warrant. Additionally, Adams clearly showed himself to be a leader of violent criminal activity on January 6, and not simply a follower or part of the crowd.  He used violence to try to take power into his own hands, and there is a substantial risk that he will attempt to do so again if released.

The government acknowledges that the defendant has limited criminal history, but in weighing the remaining factors set forth under the Bail Reform Act, this fact alone does not significantly diminish his danger or flight risk.

### D.  Danger to the Community and Risk of Flight Posed by Adams's Release

It is difficult to fathom a more serious danger to the community and the rule of law than the one posed by someone who led other insurrectionists to physically assault officers on the path to breaching and occupying the United States Capitol. Every person who was present without

authority in the Capitol on January 6 contributed to the chaos of that day and the danger posed to law enforcement, the United States Vice President, Members of Congress, and the peaceful transfer of power. Yet the defendant's conduct as a leader was particularly egregious. He aggravated the chaos and danger on January 6, and the fear inspired by his violence that day persists. As recently as March 4, 2021, members of Congress postponed various official events in light of a continuing threat to the Capitol.

No combination of conditions could reasonably assure the safety of the community; only detention mitigates such grave dangers.

## **<u>CONCLUSION</u>**

For the foregoing reasons, the government thus requests that the Court affirm the magistrate court's order of detention and detain Daniel Page Adams pending trial.

Respectfully submitted,

CHANNING D. PHILLIPS
ACTING UNITED STATES ATTORNEY

By: _____
TROY A. EDWARDS, JR.
Assistant United States Attorney
N.Y. Bar No. 5453741
U.S. Attorney's Office for the District of Columbia
555 4th Street, N.W.
Washington, D.C. 20530
Email: troy.edwards@usdoj.gov
Phone: 202-252-7081

Dated:          March 19, 2021

## CERTIFICATE OF SERVICE

I hereby certify that on March 19, 2021, I sent a copy of the foregoing to the Court's electronic filing system.

_____
TROY A. EDWARDS, JR.
Assistant United States Attorney