```
1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF COLUMBIA
2
     - - - - - - - - - - - - - - - x
3    THE UNITED STATES OF AMERICA,
                                     Criminal Action No.
4               Plaintiff,          1:21-cr-00084-PLF-2
                                     Friday, February 12, 2021
5    vs.                            11:33 a.m.

6    DANIEL PAGE ADAMS,

7               Defendant.
     - - - - - - - - - - - - - - - x
8

9    _____

10       TRANSCRIPT OF ARRAIGNMENT AND DETENTION HEARING
            HELD BEFORE MAGISTRATE JUDGE ZIA M. FARUQUI
11                 UNITED STATES DISTRICT JUDGE
     _____
12
     APPEARANCES:

13   For the United States:    TROY A. EDWARDS, JR., ESQ.
                               U.S. ATTORNEY'S OFFICE FOR D.C.
14                             555 4th Street, NW
                               Washington, DC 20001
15                             (202) 252-7081
                               troy.edwards@usdoj.gov
16

17   For the Defendant:        GARY E. PROCTOR, ESQ.
                               LAW OFFICES OF GARY E. PROCTOR, LLC
18                             8 E. Mulberry Street
                               Baltimore, MD 21202
19                             (410) 444-1500
                               garyeproctor@gmail.com
20

21   Court Reporter:               Lisa A. Moreira, RDR, CRR
                                   Official Court Reporter
22                                 U.S. Courthouse, Room 6718
                                   333 Constitution Avenue, NW
23                                 Washington, DC  20001
                                   202-354-3187

24   Proceedings recorded by mechanical stenography; transcript
     produced by computer-aided transcription
25
```

```
 1                    P R O C E E D I N G S
 2              THE COURTROOM DEPUTY:  This is Criminal Case
 3    21-84, Defendant No. 2, The United States of America vs.
 4    Daniel Page Adams.  The defendant is present by video.  Troy
 5    Edwards is representing the government.  Gary Proctor is
 6    representing the defendant.  Pretrial services is John
 7    Copes.
 8              This matter is set for an arraignment and
 9    detention hearing.
10              THE COURT:  Thank you so much.  Good morning,
11    everybody.
12              Mr. Proctor, why don't I get a chance to start
13    with you first here.  I just want to check in and see if
14    you've had an opportunity to speak now with your client?
15              MR. PROCTOR:  Yes, both last night after the
16    hearing was concluded and this morning before we started.
17    So we're good.  Thank you, sir.
18              THE COURT:  Thank you so much, Mr. Proctor.  I
19    appreciate it.
20              I just want to confirm again that your client is
21    willing to go forward via video due to the ongoing pandemic.
22    Obviously we've been holding as many hearings via video as
23    we can to preserve safety and pursuant to the CARES Act as
24    well as the chief judge's standing order.
25              MR. PROCTOR:  Absolutely.
```

1              THE COURT:  Great.  Thank you.

2              Mr. Adams, I want to turn to you.  My admonition

3      from yesterday remains, sir.  I can't know -- you're not in

4      my courtroom so I can't know if you don't understand what's

5      going on or if you have some confusion or if you need some

6      time, but there's no stop clock here.  We're here for as

7      long as we need to be; so I just need to know that if you

8      have any questions you'll let me know.

9              THE DEFENDANT:  I sure will, sir.

10             THE COURT:  All right.  Great.

11             So I'm going to turn back one second.  I want to

12      make sure from the government -- Mr. Edwards, did you

13      receive a copy of the letters?

14             MR. EDWARDS:  Yes, Your Honor, and the government

15      has reviewed the letters.

16             THE COURT:  Great.  Thank you so much.  I will

17      note that I received several letters, and I will address

18      them at the relevant time, but they were great.  They were

19      all very thoughtful and clearly from the heart.

20             One moment.  I need to speak to Ms. Lavigne-

21      Rhodes.  I'm going to pause here for a second.

22             (Pause)

23             THE COURT:  Mr. Proctor, I just want to make sure.

24      We had some technical difficulties.  I think things should

25      be fixed now, but if any of the defendant's family or

1     friends are trying to dial in, it wouldn't have been

2     working, but it should be working now.  So I don't know if

3     you need to email them.

4                MR. PROCTOR:  His wife told me that both her and

5     her mother and some others were on the line, and she just

6     texted me within the last 30 seconds that says, quote, I can

7     hear everything so we're good.

8                THE COURT:  Okay.  All right.  Good.  Thank you.

9     Yes, it's important to me that they are able to hear because

10    they obviously -- as I said, I received a lot of letters in

11    the past by volume and quality.  And quantity is not what

12    matters; it's quality that matters.  These letters were

13    particularly important, and I think that the things that we

14    will discuss are the letters of support for Mr. Adams.

15               So Mr. Proctor has stated that he is ready to go

16    forward today.  He's had time to speak to his client.

17               Mr. Edwards, you were ready yesterday, so I

18    presume you're ready again today.

19               MR. EDWARDS:  That's right, Your Honor.  The

20    government is prepared.

21               THE COURT:  All right.  Thank you.  So if you can

22    go ahead and speak to your request for detention and proceed

23    by proffer, please.

24               MR. EDWARDS:  Yes, Your Honor, and if you'd like,

25    I'm happy to start with the 3142(f) factors warranting the

1    hearing; or have you made a finding that the hearing is

2    warranted, and we can go forward with the actual hearing

3    itself?  And I apologize for the question.

4            THE COURT:  No, no problem.  Sure, why don't you

5    first make the request to have the hearing, and then we can

6    go forward.

7            MR. EDWARDS:  Great.  So, Your Honor, it's the

8    government's position that under 3142(f)(2)(A) and (B) there

9    is -- this case warrants a detention hearing.  The

10   government submits that it has proven that the defendant is

11   a serious risk of -- at the very least under (f)(2)(B) an

12   obstruction of justice risk or tampering with witnesses, and

13   the government's evidence for that is to point simply to the

14   charges here, which was an obstruction charge, including

15   Section 15 -- Title 18 USC Section 1512(c)(2).

16           And in kind of the wider context here, which I'll

17   get into if we do indeed go to the hearing, is that this was

18   one of the largest obstruction efforts arguably in American

19   history, and Mr. Adams played a rather substantive role in

20   obstructing what effectively was the peaceful transition of

21   power for the United States presidential election.  So it's

22   the government's position that that alone satisfies the

23   lower threshold of a serious risk of obstruction of justice

24   in that -- you know, his own individual criminal case you

25   know is large in magnitude to Mr. Adams but pales in

1    comparison as compared to, you know, the nation's

2    presidential election and certification on January 6th.

3            THE COURT:  Thank you.  And are you also making a

4    request based on the dangerousness, or purely under the

5    obstruction?

6            MR. EDWARDS:  Your Honor, the government -- the

7    government's read of 3142(f) is that his charges don't

8    qualify under (f)(1).  There isn't a crime of violence, and

9    a couple of the other factors don't apply.

10           That said, I do think it's relevant for the Court

11   to digest how Mr. Adams obstructed in his recent past.  He

12   did so arguably, from the government's point of view,

13   through violence and through assaulting law enforcement

14   officers and violently entering the United States Capitol

15   building.  And so while dangerousness might not necessarily

16   be an element explicitly stated in (f), because we're not in

17   (f)(1), I think it's perfectly reasonable for the Court to

18   consider the manner in which Mr. Adams has proven that he is

19   an obstructive risk.

20           And so yes, the Court does -- the government does

21   ask that the Court consider the dangerousness in terms of

22   how he executed his actions on January 6th.

23           THE COURT:  Okay.  Thank you.

24           I think that, you know, there's a low bar to

25   cross --

1              (To Mr. Proctor) Sure, one second.  I'll get to

2      you.  I promise.

3              I think there's a low bar to cross in terms to of

4      the -- but there is one to cross for the detention hearing,

5      as to whether or not it's appropriate, but I just want to be

6      clear that I think that that is a low threshold, so let's go

7      to you, Mr. Proctor.

8              MR. PROCTOR:  I was just looking at a book.  I

9      wasn't trying to attract your attention.

10             THE COURT:  Okay.  Sorry.  I thought you were

11     trying to say something.

12             MR. PROCTOR:  I have -- my fight here, Judge, is

13     whether conditions can be of release, not whether we hold a

14     hearing in the first place.

15             THE COURT:  Okay.  Great.  Thank you.  I think

16     that, as I said, it is a low bar.  As I said, I think it is

17     a low bar and that the government has proffered, and so we

18     can go forward with the detention hearing.

19             So, Mr. Edwards, if you want to proceed.

20             MR. EDWARDS:  Great.  Thank you very much.

21             Your Honor, I don't want to belabor the point too

22     much.  The government has submitted a detention memo to the

23     Court for its consideration, but I would like to hit a few

24     points as highlights.  And first I'd like to mute one of the

25     devices I have here that is going off, and I apologize.

1          THE COURT:  No problem.  That's the least of our

2    technical problems today.

3          MR. EDWARDS:  So first and foremost, Your Honor,

4    you know, as the Court is aware, there are a number of

5    factors under 3142(g) to consider in deciding whether or not

6    there are any conditions or combination of conditions that

7    can reasonably assure the safety of the community or any

8    other person and his appearance and Mr. Adams's compliance

9    with any of the Court's orders.  It is the government's

10   position that these factors, when considered in their

11   totality, make it very clear that there are no conditions

12   that can assure Mr. Adams remains not dangerous to the

13   community and not a risk of flight or a risk of not

14   following the Court's orders, and so I'll just focus on this

15   dangerousness aspect.

16          You know, the first two factors, the nature and

17   circumstance of the offense -- and it cannot be overstated,

18   the dangerousness of Mr. Adams's conduct on January 6th.

19   The Court is well aware of the background of what occurred

20   on January 6th, but just for our records, it was a day that

21   thousands of rioters stormed the United States Capitol

22   building, caused millions of dollars of damage, assaulted

23   over 81 police officers, and halted effectively what was the

24   peaceful transition of power in our United States

25   government.  Daniel Adams played no small role in helping

1    that occur.

2          Around 2:00 specifically Mr. Adams had traveled

3    over 1,400 miles from La Porte, Texas, to get to Washington,

4    D.C., and he had traveled with a co-defendant, who was also

5    indicted on similar charges having committed this conduct.

6    And when Mr. Adams found himself, having already breached

7    perimeters, on the United States Capitol grounds -- he was

8    on the stairs at the outside of the Senate wing -- behind

9    him were hundreds of rioters screaming and other rioters

10   scaling the walls and throwing items at officers.  And Mr.

11   Adams found himself at the front of that mob of angry

12   rioters yelling at the officers and attempting to do one

13   thing, which was to get inside the United States Capitol.

14         And Mr. Adams not only placed himself at the front

15   of that line, but he, in that moment, took it upon himself

16   to lead this group.  And, you know, there are different

17   kinds of leadership.  You can picture a CEO that is

18   ingrained in an institution and long-standing, but there's

19   also temporary leadership where you seize a moment, and you

20   see a number of people behind you, and you encourage them to

21   do something.  And that's what Mr. Adams did.

22         He found himself between hundreds of rioters and

23   riot shields of United States Capitol police officers.  He

24   took his phone out and he recorded himself and others and

25   started encouraging all of these other rioters behind him,

1    who were actively screaming and attempting to get to the

2    United States Capitol, and asked them if they were ready.

3    And what he meant by that, it's the government's position,

4    is ready to push forward and get to the United States

5    Capitol.

6          And as he encouraged them to get ready, he then

7    started chanting "Let's go, let's go, let's go," out loud

8    yelling at these rioters, and at the exact same time he's

9    chanting "Let's go, let's go, let's go," he can be seen

10   pushing against the riot shield of the United States Capitol

11   police officers who were doing their job in preventing an

12   angry mob of rioters from breaching the United States

13   Capitol building.

14          Unfortunately for those officers, they were

15   overwhelmed by the shear number and magnitude of the rioters

16   before them, and so those officers, as Daniel Adams pushes

17   them, retreat to the top of those steps, and Mr. Adams

18   continues to encourage others rushing around him up the

19   steps as they approach those United States Capitol police

20   officers that have now repositioned themselves at the top of

21   the stairs.

22          That still did not stop Mr. Adams from doing what

23   he did next.  Capitol Police officers then apparently strike

24   Mr. Adams such that he received a wound to be able -- in an

25   effort to stop him and other rioters from breaching and

1    getting past them to the United States Capitol building.

2          Despite receiving what was physical force from

3    these officers and a bloodied wound from his head, he didn't

4    take that as a moment to then say what I'm doing is wrong.

5    He instead pushed forward, and he ultimately, with that

6    group of hundreds of rioters, broke past those United States

7    Capitol police officers and within ten minutes he is at the

8    forefront of the doors of the United States Capitol

9    building.  And he can be seen in photos and videos bleeding

10   from his head from his conduct assaulting police officers

11   and begins chanting while other rioters are breaking the

12   windows of the United States Capitol building, "This is my

13   house."  He says that multiple times as if in an attempt to

14   encourage these individuals to continue breaking into the

15   house and take possession of what he thinks is his, which

16   was the house of government.  And I'll get to that more in a

17   second.

18          But just in describing his conduct alone, he then

19   enters the United States Capitol building 39 seconds after

20   the first individual broke into the window and entered the

21   United States Capitol in that Senate wing.  So not only was

22   he an individual who led this mob of rioters to assault

23   Capitol police officers and intimidate them and get past

24   them, but he was one of the very first individuals in there

25   having gotten in there 39 seconds after the first

1     individual.

2          Among him are rioters that have already been

3     charged with other extreme conduct and have been connected

4     to other militia groups, and the reason I bring that up,

5     Your Honor, is to not only -- to not in any way assert that

6     Mr. Adams was a part of those groups, but it's to highlight

7     to Your Honor that, micro, Mr. Adams's conduct was of course

8     dangerous in assaulting these police officers, but in a more

9     macro sense it was Mr. Adams's leadership in that moment of

10    that group to allow hundreds of other rioters he may or may

11    not have known to reach the United States Capitol building

12    successfully and cause that millions of dollars of damage

13    and to halt the United States certification of the election.

14    And so in that more macro sense, Mr. Adams put himself in a

15    position and chose to lead this group and in some ways has

16    his fingerprints all over what those other individuals did

17    because it was his conduct that helped them breach past the

18    United States Capitol police officers and reach the Capitol

19    building that day.

20         So that's the nature and circumstances of this

21    offense, Your Honor, and it can't be overstated the

22    dangerousness that Mr. Adams chose to do this with.

23         The weight of the evidence is also significant.

24    As I've noted in the detention memo, there is surveillance

25    footage.  There are social media messages.  There are social

1    media photos and videos.  Mr. Adams himself recorded his

2    actions as he charged up the steps encouraging other rioters

3    to take on these Capitol police officers, and I'd ask the

4    Court to ask yourself when doing that what reason was there

5    to choose to film yourself doing this other than for some

6    sort of trophy or posterity afterward?

7           And so, you know, Mr. Adams has, in his resume, a

8    quote that says:  Integrity is doing the right thing when no

9    one is watching.  But what Mr. Adams chose to do that day

10   was a crime while the world was watching.  And so I would

11   ask Your Honor, as you look at those letters, which are

12   heart-warming and clearly deeply personal, and I don't in

13   any way intend to step on those letters, but what I would

14   ask the Court to consider in considering the weight of the

15   evidence and those letters and how they interact with this

16   case is

17   to ask yourself if Mr. Adams was willing to do this with

18   such a strong support network, what can convince the Court

19   that that strong support network will be able to contain

20   Mr. Adams from doing something similar or not appearing to

21   be a danger to his community after he had already done that

22   when he had this support structure?

23          And so, Your Honor, moving on to, then, the third

24   factor of just the history and characteristics of Mr. Adams.

25   He does have a light criminal history, and the government

1   admits that and doesn't point to it as a significant factor.

2   But the government asks the Court or submits to the Court

3   that that light criminal history should not in any way

4   mitigate the conduct that he chose to conduct -- that he

5   chose to do on January 6th.  It just does not mitigate his

6   dangerousness to the community, particularly when you read

7   what his role in his local community is.  It appears to be

8   strongly correlated to guiding children, and it's the

9   government's position here that while there is no accusation

10  that Mr. Adams has in the past presented a danger to those

11  children, the government's concern with releasing him back

12  into positions of leadership for children is that the last

13  position of leadership he took was to take on

14  insurrectionists and rioters and lead them into breaching

15  the United States Capitol that should inform the Court as to

16  whether he should be in any leadership role in his community

17  as of right now.

18          And finally, Your Honor, the nature and

19  seriousness of the danger that Mr. Adams would present to

20  the community and the fourth factor under 3142(g), I would

21  ask that another theme that appeared a number of times

22  throughout the letters that his family and friends submitted

23  was that Mr. Adams harbors a love of his country.  But

24  Mr. Adams, on January 6th, chose to lead a number of rioters

25  to attack the heart of that country, and so I would question

1    whether his deformed love of his country should give the

2    Court any comfort that he has respect for the rule of law or

3    would appreciate that the orders that the Court would order

4    on Mr. Adams when he is released are something to be

5    respected.

6         And so for those reasons and for the reasons in

7    our detention memo, Your Honor, it's the government's

8    position that there are no conditions that can assure the

9    safety of his community or his appearance or his compliance

10   with Court orders.

11        THE COURT:  Thank you, Mr. Edwards.

12        We have -- it looks like Mr. Copes is on from

13   pretrial services; is that right?

14        PRETRIAL SERVICES:  Yes, Your Honor; John Copes,

15   pretrial services.

16        THE COURT:  I'd like to hear from pretrial.

17        PRETRIAL SERVICES:  Pretrial services makes the

18   following recommendation, that there are no conditions or

19   combination of conditions that can reasonably assure the

20   defendant's appearance or safety to the community.

21        THE COURT:  Thank you, Mr. Copes.

22        Mr. Proctor, I'm happy to hear from you next.

23        MR. PROCTOR:  Thank you, sir.

24        I'm really not here to grandstand.  I don't think

25   it would behoove my client to get into who said what at a

1    national executive level.  What I'm primarily here to

2    discuss is will he break the law in the interim and will he

3    come to court?  And I think the answer to those is a

4    resounding yes.

5              I do want to talk a little bit about the co-

6    defendant.  I'm not sure it's Mr. "Kon-al or "Ka-nell."

7    I'll go with "Kon-al."  Someone will tell me if I'm wrong.

8    He was released both in Louisiana, where he made his initial

9    appearance, and I saw the order entered last night by Judge

10   Meriweather in allowing him to continue on conditions of

11   release, which is at ECF-15 on Your Honor's docket.

12             His conditions were that he report to pretrial

13   weekly; we have no problem with a similar condition for my

14   client.

15             That he only come to D.C. for meeting with his

16   court hearings or meetings with his lawyer; I have no

17   problem with the same condition for my client.

18             Tell pretrial if he's leaving Louisiana; we would

19   have no objection to a condition of telling pretrial if he's

20   leaving Texas.

21             No firearms.  You see it in my client's wife's

22   letter.  When the search warrant was executed, the firearms

23   were taken.  We're not asking for them back.  You can

24   absolutely fashion a condition of release that requires him

25   not to have or be around firearms during the pendency of

1    this case.

2            And the government mentioned he had strong support

3    and he still committed this crime, and what I would say to

4    that is he had strong support in Texas, and it's no accident

5    that this crime happened in D.C.  And frankly, Your Honor,

6    his wife and I have talked about it.  If Your Honor were to

7    release him, he will be on the first flight -- or he

8    actually doesn't have ID; it may end up being a Greyhound

9    bus -- back to Texas as soon as this is over, and I would

10   anticipate flying to Texas for all future client meetings.

11   And with COVID, who knows when he'll be back in the District

12   of Columbia?

13           So those letters, to me -- and I'll talk to them a

14   bit more in a minute -- speak resoundingly to in his

15   community he's an asset, and it is an aberration that when

16   he goes to D.C. with only his cousin -- who, again, I'll

17   talk to about in a minute -- is when these crimes happen.

18           I'd like to talk a little bit -- because, you

19   know, in the sentencing context we call it, to avoid

20   unwarranted disparities between similarly situated co-

21   defendants.  In the Bail Reform Act context I guess it's to

22   avoid unwarranted disparities pretrial.

23           If you look at the amended complaint, Your Honor,

24   which is filed in the magistrate case, your magistrate case,

25   21-81, it talks about how Mr. Connell said, "We will be

1   back, and it will be a lot worse."  There is no allegation

2   that my client was privy to that conversation, liked it,

3   joined in it, or in any way endorsed that view.  Mr. Connell

4   said -- someone else said actually, "It's going to come to

5   civil war," and Mr. Connell said, "It's looking that way,"

6   or words to that effect.  No evidence my client knew,

7   endorsed, joined, agreed, nodded to anything like that.

8        Mr. Connell said he intended to return for I think

9   the inauguration, is what he was talking about, next week or

10  something.  Again, my client was never planning to return to

11  D.C. for anything related to any of this.

12       And Mr. Connell said, "I'm not going home to

13  Louisiana unless it's in a body bag."  Again, there's no

14  suggestion my client in any way endorsed those views.  He

15  was more than happy to get out of the nation's capital and

16  rush to Texas.

17       The government mentioned in their memo my client

18  didn't have a weapon.  I was thinking back -- I can't

19  remember which war it was, if it was Vietnam or something,

20  that they gave the soldiers, like, playing cards with

21  pictures of people they were look -- it's my position my

22  client's a five of hearts, you know.  He's -- it's not to

23  excuse his actions, and in no way am I attempting to make

24  that, but he's not -- they're not calling me and asking me

25  to go on CNN for this one.  They're not playing it on

1    continual loop on the cable networks.

2              You know, the government talks about how he led

3    the charge.  There were thousands of people behind him.  I'm

4    not sure he was at liberty to turn around and walk in the

5    opposite direction.

6              So at best, you know, he's -- the government

7    talked about the CEO.  He's middle management even if you

8    accept everything the government said as 100 percent true.

9    And when we get to that, you know, I must have had 100

10   detention hearings by now, Judge.  I'm sure you have, too.

11   But never once have I heard a prosecutor say, "Well, I don't

12   know about the weight of my evidence on this one, Judge.  It

13   could go either way."

14             So it really doesn't -- you know, they've seen the

15   videos, the cell phones, the communications I have, and so

16   I'm not really resting my case on the weight of the

17   evidence.  I'm saying even if you accept everything at face

18   value, there are still conditions that can be fashioned --

19   and this isn't a presumption case -- that would ensure the

20   safety of the community and my client's appearance in court.

21             You know, he has no real criminal history.  The

22   government mentioned -- the pretrial services report said he

23   did four days for a prior.  My client thinks it was four

24   hours.  I'm not sure the resolution of that answer moves the

25   needle in any way.  I think the one thing I really take

1     umbrage with in all of this is the government saying he's a

2     flight risk.  I think that's patently untrue.

3            You know, you have 32 letters.  And I've been

4     doing this a while, and I don't think I've gotten halfway to

5     that before.  And all of this was after your hearing last

6     night.  I called his wife.  I said, "Hey, you know, if

7     there's anyone in the community that would like to say nice

8     things about him, you know, here's my email address.  Please

9     have them email it to me."  And I got 32.  Some of them came

10    in at midnight and 1:00 in the morning.  People were

11    motivated to say nice things about this man.

12           You've got a sister who is willing to pledge her

13    house.  You've got obviously my client who is willing to

14    pledge his.  About an hour ago, Judge, I got his

15    retirement -- and I'm happy to forward it to you, if you'd

16    like, but in his Fidelity account, I think it is, he has

17    $34,000 saved up for retirement.  I'm happy to pledge that

18    as some sort of unsecured loan as a condition of release.

19           Mr. Kuhm, K-U-H-M, I spoke to him last night, and

20    you have his letter, and that one I wanted to particularly

21    highlight because there's a good job waiting for my client.

22    He needs a welder, and he's aware of it.  He knows what he's

23    charged with.  He's happy to put him to work if you release

24    him.  So if you release him, he's paying taxes; he's paying

25    your salary and mine, Judge, because I'm court-appointed.

1    If you don't release him, we're paying his room and board.

2    I mean, it's stark.

3         His wife.  I don't think anyone here disputes that

4    she is a poster child for what a third-party custodian looks

5    like.  She has no record.  She has his passport and is happy

6    to drive it -- if Your Honor wants to make that a condition

7    of release -- I don't think with COVID any of us are going

8    anywhere anyway, but she's happy to either mail it to me or

9    mail it to the clerk's office or drive it to her local

10   federal courthouse and get a receipt for it.

11        There are no weapons in the house that I've

12   mentioned, and his wife, which is relevant, was laid off in

13   May because of COVID.  She was working as a salesperson in

14   the welding industry.  So you've got a wife with five

15   children between them not working, and you've got a man

16   that, should you release him, will be able to pay the bills,

17   keep a roof over their head, all of that.

18        As the government, to their credit, acknowledged,

19   my client is not a member of a far right organization.  You

20   know, he's not a Proud Boy.  To the contrary, you can tell

21   from the letters that he's very proud of his boys on the

22   baseball team.  There are letters that speak to him rescuing

23   people from hurricanes, taking his boat and taking his car

24   after the hurricane's gone through, taking people away from

25   the roofs of houses.  And, again, it's -- the distinction

1  I'm trying to draw here is the person that appeared in D.C.

2  that day is night and day from the person in Texas, and

3  that's where we're asking he reside pretrial.

4              And Your Honor should have zero doubt that

5  Mr. Adams in Texas is a sterling example to his community,

6  friends, and co-workers.  There is zero basis to believe

7  that when he returns to Texas he will be a threat to anyone,

8  and there's an ample basis to believe that he will be an

9  asset to his community and provide for his family.

10             This is a case where he consented to detention, as

11 the government's memo mentions, in Texas, so that's

12 significant in that there wasn't a finding by one of your

13 colleagues in the Eastern District of Texas that there were

14 no conditions that could be fashioned.  Your Honor has an

15 unplowed field in this regard.

16             And I sent you his resume, Judge.  It's the last

17 thing I want to mention.  And if you look at that, I mean,

18 he's got more letters after his name than you or I do, I

19 think is the short version of it.  A life-long working

20 record.

21             I don't know.  You may have lots of letters after

22 your name, Judge.  You can correct me if I'm wrong.  But

23 he's got more than me, at least.

24             The letters, again, they speak to the sterling

25 character this man has, and, you know, if you release him, I

1    have zero doubt he will be in Texas at some point tomorrow,

2    and Your Honor can be assured that with checking in with

3    pretrial and their monitoring, you will not have a problem

4    in the interim.

5             So with that, I respectfully suggest to the Court

6    that there are conditions of release that can be fashioned,

7    and Your Honor should enter an order so reflecting in this

8    case.  Thank you.

9             THE COURT:  Thanks so much.

10            Mr. Edwards, I don't think I need to hear anything

11   more from the government, but to the extent there's anything

12   you feel you need to get out.  I think you've covered it

13   all.

14            MR. EDWARDS:  No, Your Honor.

15            THE COURT:  We're going to take a five-minute

16   recess.  I just want to take a chance to get everyone

17   collected here, including myself.  So let's say it's 12:06

18   now.  We'll be back in -- let's just say 12:15.  We'll be

19   back at 12:15.

20            MR. EDWARDS:  And, Your Honor, rather than sign in

21   again, just mute myself and turn the video off?

22            THE COURT:  I'm just going to turn off the video.

23   You're welcome to do the same.

24            MR. EDWARDS:  Thank you.

25            (Recess taken)

1          THE COURTROOM DEPUTY:  Recalling Criminal Case

2     21-84, Defendant No. 2, *The United States of America vs.*

3     *Daniel Page Adams.*

4          THE COURT:  Thank you, Ms. Lavigne-Rhodes.

5          Mr. Edwards, just one quick question before we

6     start.  As you described the conduct, it involved sort of --

7     that there's police lines and multiple instances where they

8     are breached, like twice, I think, and the third time they

9     breached the building.  You know, is your allegation that

10    there was, you know, any physical sort of contact with the

11    police officers, pushing their shields?  Can you just

12    describe to me in both instances kind of what happened.

13         MR. EDWARDS:  Yes, Your Honor.  So the first

14    instance of what I'm characterizing as assaultive conduct is

15    when Mr. Adams is standing about halfway up the flight of

16    stairs that lead up to the Senate -- to the Congress build

17    -- I'm sorry, Capitol building.  And there are a number of

18    Capitol police officers standing with their shields up that

19    are stopping kind of this crowd of rioters from going any

20    further up the stairs.

21         What the evidence will show is that Mr. Adams at

22    some point -- it's around 2:00 -- starts encouraging the

23    others behind him and then reaches out and physically pushes

24    the riot shield of the police officer and starts pushing up

25    against him, and that was right after encouraging everyone

1    to get ready and chanting, "Let's go."  And as he does that

2    you see almost at the exact same time this rush of rioters

3    almost doing the same thing; so you can kind of picture a

4    narrow, maybe, five-foot staircase, and you can picture kind

5    of rows of rioters that start doing that same thing that

6    Adams at the front was doing physically against the United

7    States Capitol police officers.

8              Then those officers retreat, and from Mr. Adams's

9    own view on his video, he has -- he chases up after them

10   with the other rioters now who start kind of rushing with

11   him up the stairs; and so that's what I was characterizing

12   as intimidating or assaultive conduct.  Although chasing

13   after them doesn't constitute physical contact, it is my

14   argument, Your Honor, 111, that there is a variety of ways

15   to commit that charge, and so intimidating them and charging

16   after them as they attempt to retreat and then reposition

17   is --

18             THE COURT:  Sorry, we lost you.

19             MR. EDWARDS:  At the top there's a skirmish with

20   officers.  We're still investigating that.

21             THE COURT:  We lost you there for a second.  You

22   got to the -- explained what happened and the nature of 111,

23   that it does not have to be physical touching.  It can be

24   threatening conduct.  And then you start describing the

25   second sort of --

1            MR. EDWARDS:   Okay.  So now that's constituted the

2     first interaction that was physical contact, pushing them.

3     Now he's chasing after them, continuing to chant, "Let's go,

4     let's go."

5            Now we'll proceed up to the top of the stairs.

6     There is a skirmish between Mr. Adams and the officers.

7     We're still investigating the specific nature of that

8     engagement.  What we do know is he attempts to get past the

9     officers, and it results in the officers having to use force

10    to stop him.  As the officers were attempting to quickly get

11    a metal barricade there, we know that it results in a

12    physical altercation because Mr. Adams immediately starts

13    grabbing his head after a loud thud and, you know, uses an

14    expletive.

15           We also have a description of his co-defendant

16    that wrote -- and you can see this in the statement of

17    facts.  He allegedly detailed that incident, and the video

18    shows that the co-defendant was actually with him next to

19    him engaging in this similar conduct going up the stairs. So

20    we know that he was there and witnessed it and was part of

21    it.  So he describes it to somebody else as them assaulting

22    the officers at the top of those stairs, and the way the co-

23    defendant describes it is they assaulted the officers, and

24    they dropped their gear, and they -- he and Mr. Adams --

25    continued towards the Capitol building.

1          Now, the government's allegation is not that there

2     were officers at the doors of the Capitol building.  It was

3     just simply that there were other rioters, and we have

4     different camera angles of them starting to smash windows as

5     Mr. Adams chants, "This is my house," and then enters the

6     open doors.

7          THE COURT:  Okay.  Thank you.

8          MR. EDWARDS:  Yes, Your Honor.

9          THE COURT:  Just one moment.

10          (Pause)

11          MR. PROCTOR:  And, Your Honor, if I may be heard

12     very briefly on that point?

13          THE COURT:  For sure, Mr. Proctor.  Go ahead.

14          MR. PROCTOR:  Mr. Adams, can you kind of put your

15     head down and tilt it to the left?

16          Do you see there at the top of his head, Your

17     Honor?  That is the mark, the blood, that the government's

18     talking about.

19          Thank you, Mr. Adams.

20          And despite, you know, what is still a month later

21     a serious scar, there's no suggestion my client grabbed a

22     flagpole and broke anything, hit anyone with a clenched fist

23     or anything like that.  So if you believe the government,

24     yes, there was some sort of a pushing and a shoving match,

25     but there's certainly nothing to suggest that even that

1    injury, that hit to his head, resulted in him escalating to

2    violence.

3              THE COURT:  Thank you, Mr. Proctor.

4              So, Mr. Adams, I have to think about -- these are

5    very difficult decisions.  This is a close case.  I think

6    where I try to review -- I'm trying to square two people,

7    Mr. Adam, and I'm so incredibly frustrated to have to do

8    this because I see from your letters a very good person, and

9    a kind, thoughtful person, and we'll talk about that in

10   length.  I can read letters about you all day, Mr. Adams,

11   because it is inspiring to read them.  And then I hear from

12   Mr. Edwards and I hear a totally different person in conduct

13   that is abhorrent and that -- but that's an aberration.  It

14   seems like, you know, it wasn't who I thought anyone that

15   would read those letters thinks you are, and I'm trying to

16   square those two things.

17             And somebody put you in this situation.  I think

18   you have some responsibility.  We'll talk about that.  But

19   other people -- we'll talk about your letters.  People felt

20   like you were incited, and I am so incredibly frustrated to

21   be in this situation where I have to sit and think about why

22   is a good person, a patriot, why would he do these things?

23   And is he responsible, or is someone else responsible?  And

24   as I sit here, you know, I'm struggling, honestly, with

25   that, Mr. Adams.  I really am because these are very serious

1    charges.

2         Arguably -- you know, we'll talk about the nature

3    and circumstances -- it's hard for me to imagine more

4    serious as the government has described.  They view them as

5    attempting to stop the lawful, you know, process of

6    democracy.  The lawful moving forward of the democratic

7    process that our country, our nation, is founded upon was

8    trying to be stopped in a crime of which we had not seen in

9    18 generations; and yet, at the same time, you know, I look

10   at you as a person, and can you follow conditions or a

11   combination of conditions to ensure that you will not be a

12   danger to the community or a flight risk?  And so I am

13   struggling with this.

14        There's two different standards.  The

15   preponderance of the evidence is a lower standard for the

16   question of whether or not there is a flight risk, or the

17   higher standard of clear and convincing evidence that there

18   are no conditions or combinations of conditions that will

19   reasonably assure the safety of the community.

20        So the Bail Reform Act tells me that I have to

21   look at four factors:  nature and circumstances of the

22   offense you are charged with; the weight of the evidence

23   against you; your history and characteristics; and the

24   nature and seriousness of any danger to a person or the

25   community.  And I'm going to go through these four factors

 1     and tell you how I will rule.

 2             I want to be clear on two points.

 3             First, I am not sitting here in judgment of you,

 4     sir.  You strike me as a person of faith, as I read your

 5     letters of support.  I am as well.  That is not my job.  I'm

 6     not equipped to do that.  None of us, frankly, are equipped

 7     to sit in judgment on another person.  I am here to only

 8     think about those two things, the dangerousness to the

 9     community and the flight risk, and so that's not what's

10     before me today.

11             What's before me is an innocent person, because

12     that's what the law says you are.  It says you are innocent

13     but that also I have to consider those four factors as I go

14     through them.

15             Unfortunately, Mr. Adams, it's not -- I can't find

16     in your favor today.  I'll go through the factors and talk

17     about why, but I believe that detention is appropriate here.

18             We'll start with the nature and circumstances of

19     the offense.

20             The nature and circumstances that the government

21     has described is abhorrent.  In particular here, I focus on

22     two things.  One, the overall nature of this conduct.  It is

23     conduct that is not captured by the nature of the offense.

24     This was an attack on the foundation of the democracy of

25     this country.  It is hopefully something that will not again

1    happen for generations, but it is a crime that is truly a

2    crime that is not captured by the penalties or the name of

3    it.  It is -- it was a breakdown of the fabric of our

4    country, of our society.  We are fellow Americans, each one

5    of us, and what happened that day is truly shocking.  And so

6    the nature of that offense in and of itself as a baseline

7    concerns me greatly.

8            But what is more troubling to me is that, you

9    know, as I read your letters, you are a leader.  You're a

10   community leader.  You're a leader in your family.  And in

11   each one of those instances you lead with dignity and grace

12   and thoughtfulness.  But on January 6th I see you also as a

13   leader.

14           In the sentencing guidelines we look at leaders,

15   organizers, managers, and supervisors, and they're penalized

16   more harshly.  In this instance, I rely on the government's

17   evidence.  The government's evidence is that you were in

18   part leading this riot.  I think about the people who are

19   behind you, who are like you, and, you know, what do they

20   think.

21           You know, everyone has, except for a few people in

22   this instance, someone to point to who led them down this

23   terrible path.  I don't think that few, if any, people

24   thought now that it may have been a good decision, but some

25   may.  I don't know.  But there are people who look to the

1    person ahead of them in the line and they say, "That person

2    encouraged me to do this.  I lost my mind.  I shouldn't have

3    listened to them, but I did."

4            And so my concern is that for someone who is a

5    leader like yourself, that there is a different consequence

6    to the nature and circumstances of the offense than is for

7    the people who were behind you in the line.

8            And let's be clear, Mr. Adams.  I know there are

9    people ahead of you in the line, the people that incited you

10   to do this, and they are whom my greatest frustration is

11   with.  They are not before me; you are.  But I only hold you

12   responsible for what you did, not for what they did and not

13   for what the people behind you did.  I only look at your

14   case, and I think about what you did.

15           As I read the statements in the criminal

16   complaint, as you were encouraging people, I see what

17   appears to be a serious offense, that people were asked at

18   the initial breach line, and you were in charge.  You told

19   them to go forward.  You fought with law enforcement.

20   Something that I imagine is hard for you to believe that you

21   did, but you did, and you led those people.

22           And then you had an opportunity to stop.  And it

23   may have been difficult, Mr. Adams.  It may have been very

24   hard to turn around at that moment, but you could have.

25           And then you went up the stairs again.  And then

1    you fought with police officers again to what the government

2    is describing as such assaultive conduct, whatever it was,

3    that it caused them to discharge a firearm with a rubber

4    bullet that injured you, and that your cousin has described

5    also as assaultive conduct that resulted in the discharge of

6    that -- the rubber bullet.

7         And that while -- I'm going to come to you.  Don't

8    worry.  I'm going to come to you.

9         While you were bleeding, you still made the

10   decision to go forward, and that you pushed through these

11   law enforcement, and that you went through and then

12   ultimately you entered the building.

13        So the nature and circumstances of the offense, as

14   I see it, is that because of your leadership role as well as

15   that you had multiple opportunities to stop, that you did

16   not, and third, that because there was actual assaultive

17   conduct in here, I think that you are a danger.  You, on

18   three instances, made bad choices, two of which involved

19   assaultive conduct.  That gives me great concern for

20   dangerousness that we'll talk about later.

21        The weight of the evidence is the least important

22   factor to me.  I agree with Mr. Proctor.  The government

23   always believes it has a strong case.  Here, frankly, it

24   does seem like it in part through the unfortunate

25   circumstance that you have a family member who -- and

1    friends and yourself who are videotaping or, you know,

2    people around you are videotaping what happened.  It's quite

3    clear that, you know, the allegation describes that the

4    weight of the evidence is strong.

5            Your history and characteristics.  I'll read --

6    I'll turn to the letters.  I spent a lot of time thinking

7    about these.  I'll start talking about -- let's talk about

8    your community service.  I think your history and

9    characteristics frankly weigh in favor of release when I

10   read one letter from one of your friends, and they say,

11   quote, When we sit here and think of a good husband, a good

12   father, a hard worker, a man that loves his country, a man

13   that values his family and the people around him, we think

14   of Daniel Adams.  I can understand why they think of that.

15   I see the concrete evidence.  People say they love their

16   country, but I see that in you, what you've done to date,

17   that you care about your community.  What's more American

18   than that?

19           I read the letters from several people, family

20   members, who describe -- there was one letter that said,

21   quote, He was on the front lines when Hurricane Harvey hit

22   risking his own life, using his boat and other equipment to

23   rescue people that were standing or clinging onto their

24   lives to bring them to safety.

25           And here's something that multiple people said

1       independently.  He would take the shirt off of his back to

2       help someone in need.  He only wants to protect his family

3       and neighbors.

4               I read several letters where people describe that.

5       They describe that you care about your neighbors.  I read

6       about how, when a family member or friend lost a son, that

7       you were there to comfort them, an 18-year-old son.

8               I read about how when someone had a motorcycle

9       accident you were there.  You're always there.  You're

10      leading to care for your community.

11              And I am concerned about your family and how

12      they'll be provided for.  This is why detention is always

13      such a difficult decision.  It's because everyone in the

14      heat of the moment may not be thinking what -- you know,

15      weeks or months down the road what are the consequences for

16      my family.  And not just their families.  You are a pillar

17      of your community.  What's going to happen to your neighbors

18      when they need help?  I don't know.

19              My hope is that your neighbors will find a way to

20      come together and support your family and themselves, but

21      there will be a big piece missing with you not there.

22              Another person told me, when they wrote the

23      letter, that I need to better understand who you are.  And

24      I'm trying.  I want to understand who you are.  The problem

25      is the better that I understand you, the more confused I am.

1          I look at one letter from a family friend who

2    wrote, "I know that what happened at the Capitol was wrong,

3    and I have no idea how he got mixed up into the situation,

4    but I know he is a good man, and his family needs him.  It's

5    such a messed up and confusing situation, and I am in shock,

6    and my cousins are -- that my cousins are even going through

7    this.  I'm praying for peace and understanding for my

8    cousin."

9          A letter from your mother-in-law, which I don't

10   know if my mother-in-law -- I hope she would write a letter

11   for me; but she deserves special credit for that.  She said,

12   "He may not be perfect, but who of us are?  He loves his

13   family.  He works hard and wants good for all."

14          Your little sister wrote in, who described herself

15   as a little bratty sister, and she wrote a beautiful letter

16   about how much you care about your family, you wanting to be

17   there for your family, and how important that is to you.

18          You have a friend who described you as a patriot;

19   talked about, as I said, the memorial service, how you were

20   there to give him a hug and help him on.  He talked about

21   you're God-fearing and how much you love this country.  He

22   said, "Unfortunately something happened, and there seems to

23   have been some mob mentality that broke out, and he got

24   caught up in that."

25          The last letter that I'll reference is from your

1    wife, for the risk factor, and I will just say it was

2    certainly the most difficult to read.  She cares about you

3    greatly and talked about -- talked about your wedding

4    anniversary coming up and how much she wants to support you,

5    and I -- it's very difficult for me to sit here.

6            Again, I am not judging you as a person.  Frankly,

7    if I was, I would judge you as a good person.  I hope I'm as

8    good of a person as you, Mr. Adams.  People know about you

9    through your good deeds, through your leadership and your

10   community, and so I'm trying to square that, again, but in

11   history and characteristics it seems to me that release is

12   appropriate.

13           And so then I go to the final factor, which is the

14   third factor, which is dangerousness to the community.  I

15   can't put myself in your shoes.  I've tried to.  I read a

16   letter from -- one of the letters of support -- hold on --

17   which was from -- I thought perhaps one of the most moving

18   letters is from a neighbor, and this neighbor says that she

19   believes you got caught up in a movement that was incited by

20   a person -- it doesn't matter who she says it was -- and

21   acted in a way that in hindsight he would never have done on

22   his own without the incitement from the crowd.  That person

23   created the perfect storm to enrage and invoke those that

24   were not there for violence.  The crowd of peers brought

25   chaos.  I do not believe in my heart of hearts that Danny

1   Adams went to D.C. to be involved in a riot.  He's an

2   honorable, respectful man who would never sacrifice his

3   family and home life for such actions.

4          And so this is where I have to get to

5   dangerousness, is that I think that you were incited.  Let

6   me be very clear.  Everyone who knows you.  How could

7   someone see you now and not think that you were incited?

8   You were incited.  There were -- someone went and poured

9   gasoline around the Capitol building.  They left the kinder

10  there for burning.  They put the wood and then released a

11  mob there, and then all that was required was one spark to

12  light that barn fire.

13         You didn't do any of that, and I credit you for

14  that.  It's not your fault.  However, I do believe that the

15  government makes a distinction.  The law recognizes that

16  managers, organizers, supervisors hold a different role than

17  do people who are less culpable.

18         You know, I look at other defendants.  The

19  government has not asked for detention except in the most

20  rare of cases here.  The vast majority -- I would say less

21  than 10 percent, from what I've seen from the criminal

22  complaint, have they asked for detention.

23         The fact that your cousin, who made other

24  statements -- I can't speak to that.  I don't know why Judge

25  Meriweather ruled the way she did or the magistrate judge

1    did in another jurisdiction.  I can only say what I see

2    before me, and I see before me evidence of an organizer who

3    engaged in assaultive conduct.  And so then, as I think to

4    dangerousness, I have to think about what is going to happen

5    in the future?

6            This tense moment has not passed.  The kinder is

7    still there.  You know, the kindling -- sorry, the kindling

8    is still there.  The gasoline is still there.  There are

9    still troops surrounding the Capitol building.  I think that

10   that -- you know, the fact that there has not been other

11   conduct is only through the sacrifice of our service

12   members, but I'm trying to imagine what happens.

13           Some of the inciters have been muted, and for that

14   it's been a blessed reprieve, but not everyone can be muted,

15   and frankly that can only go on for so long.  And so my

16   concern is that we're at a moment, still, that is a tense

17   moment.  What happens a day from now, a week from now, when

18   the next conduct happens where someone says, "Raise to arms,

19   overthrow this illegitimate government"?

20           And my concern is that I don't know how I can

21   believe -- because I just -- I can't understand getting into

22   a situation where you think that it is okay to assault

23   police officers and try to breach the Capitol building and

24   then to go in.  And so I don't know how can I square that --

25   what happens when someone incites again, that you don't do

1       the same.  So I have a fear for the danger to the community.

2              At the end of the day, I have a fear for your

3       family.  I have a fear for your family that you not being

4       there is a problem.  And so I have these two dangers, and

5       I'm trying to weigh the benefit to the community.

6              The community doesn't get anyone here.

7       Mr. Edwards -- and he did a good job speaking for the

8       government and for the public, but the community doesn't

9       have people here.  There are a whole group of people who

10      were inside that building who, perhaps, if they were to come

11      up here, they would be flabbergasted that I even think this

12      is a close case because for them they were fearful for their

13      lives.  You've heard some of them speak.

14             And to suggest -- I don't want to minimize your

15      counsel.  I would say Mr. Proctor, to his credit, did not

16      attempt to minimize any of the conduct that happened.  They

17      were just thinking about the future though.  And as I sit

18      here and think about these things, I think that there is

19      still a risk; and so ultimately, I think, because of that, I

20      think detention is appropriate.

21             So what I'm going to do now is, Mr. Adams,

22      I'm going to give you -- put you in a breakout room with

23      Mr. Proctor.  I'm going to let you speak, if that's what

24      Mr. Proctor thinks and you think is appropriate.  So that

25      will be a ten-minute breakout room, and we'll be waiting for

 1     you all to come back out.  Then if you want to state

 2     something, you can.

 3             As I said, this is not the final decision.  This

 4     is my decision.  You have the opportunity to appeal it.

 5     I've been overturned before.  I don't disagree with those

 6     decisions.  These are not legal decisions.  These are fact

 7     decisions.  They're very challenging.

 8             So, you know, perhaps you'll get a different

 9     opinion from a different judge.  Maybe not.  I don't know.

10     I think that all I can tell you is what I see today as the

11     law as it's directed to me, and this is how I ultimately

12     believe that the law should be applied.

13             So let me give you some time to talk to your

14     lawyer.

15             MR. EDWARDS:  Your Honor, may I make just one

16     quick statement before they go?

17             THE COURT:  Yes.

18             MR. EDWARDS:  And the only factual clarification

19     that I wanted to add is that the government continues to

20     investigate the specific cause of Mr. Adams's injury.  It is

21     the government's belief that it was caused as part of that

22     interaction with the police.  I just mean the specific

23     detail as to whether it was a baton or a discharged rubber

24     firearm.  We do have evidence that his co-defendant

25     described it as such, but we're still investigating the

1     reality of what occurred there.

2              THE COURT:  I mean, that's not relevant, but thank

3     you.

4              MR. EDWARDS:  Right.

5              THE COURT:  How the injury occurred does not

6     matter or the exact mechanics of it.  That it occurred and

7     that, you know, it resulted in someone bleeding and being

8     injured yet they continued forward, they were not deterred,

9     that is what concerns me.

10             So, Mr. Proctor, I'm just going to put you -- if

11    you want five minutes.  Ms. Lavigne-Rhodes will pull you out

12    in five minutes, okay?

13             MR. PROCTOR:  Yes, sir.

14             THE COURT:  Okay.  So we'll be on hold for five

15    minutes.

16             Ms. Lavigne-Rhodes, I'll call you.

17             (Recess taken)

18             THE COURT:  Okay.  Mr. Proctor, are you all right

19    with your client -- letting your client speak, or do you

20    want him to?

21             MR. PROCTOR:  I don't believe there is anything to

22    say.

23             THE COURT:  Okay.  I want to go through and

24    arraign your client now on the indictment.

25             So you've received a copy of the indictment now.

1     Have you had an opportunity to go over it with your client?

2          MR. PROCTOR:  I have twice, Your Honor, gone

3     through with him the nature of the charges.

4          THE COURT:  Okay.  I will go through the

5     indictment now just to notify your client of the charges.

6          Count 1 charges civil disorder in violation of 18

7     USC 231(a)(3).  It carries with it a term of imprisonment

8     for not more than five years, a fine of $250,000, or both.

9     In addition, the Court may impose a term of supervised

10    release of not more than three years.

11         Count 2, obstructing, influencing, and impeding an

12    official proceeding in violation of 18 USC 1512(c)(2), up to

13    20 years in jail, a fine of up to $250,000.  In addition,

14    the Court can impose a term of supervised release of three

15    years.

16         Charge 3, third count, is assaulting, resisting or

17    impeding certain officers, 18 USC 111(a)(1), a term of

18    imprisonment for not more than one year and a fine of not

19    more than $100,000, if simple assault, or greater terms of

20    imprisonment if the assault involves physical conduct,

21    contact, or intent to commit another felony.  There's also a

22    term of supervised release of up to three years if it

23    involved physical contact.

24         Count 4, entering and remaining in a restricted

25    building, 18 USC 1752(a)(1); a term of imprisonment for not

1      more than one year, a fine of $100,000, or both.  In

2      addition the Court may impose a term of supervised release

3      of not more than one year.  Higher potential penalties may

4      exist depending on the nature of the offense.

5                  Count 5, disorderly and destructive conduct in a

6      restricted build, 18 USC 1752(a)(2), a term of imprisonment

7      of not more than one year, a fine of --

8                  THE COURT REPORTER:  Your Honor, could I ask you

9      to slow down, please?

10                 THE COURT:  Sure.

11                 THE COURT REPORTER:  I know you're reading.  It's

12     very hard to get you.

13                 THE COURT:  No, no problem.

14                 Count 5 is disorderly and disruptive conduct in a

15     restricted building, 18 USC 1752(a)(2).  It carries with it

16     a term of imprisonment for not more than one year, a fine of

17     $100,000, or both.  In addition, the Court may impose a

18     period of supervised release.

19                 The next is Count 6, disorderly conduct in the

20     Capitol building or grounds in violation of 40 USC

21     5104(e)(2)(D).  It carries with it a term of incarceration

22     of not more than six months, a fine of not more than $5,000,

23     or both.  Again, the penalty could be higher depending on

24     other conduct of the defendant, if he is found guilty of it.

25                 Count 7 is impeding passage to the Capitol grounds

1     or building, violation of 40 USC 5104(e)(2)(E).  It carries

2     with it a term of incarceration for not more than six

3     months, a fine of not more than $5,000, or both.  Again, the

4     penalties could be higher depending on other conduct.

5              Finally, Count 8, violent entry and disorderly

6     conduct on Capitol grounds in violation of 40 USC

7     5104(e)(2)(G), carrying the same penalties as the previous

8     offenses.

9              Mr. Proctor, does your client wish to have a

10    formal reading of the indictment, or does he waive that?

11             MR. PROCTOR:  He would waive that, Judge.

12             THE COURT:  Thank you, Mr. Proctor.

13             I will not read the indictment.  Counsel has

14    received a copy of it and explained it on two occasions now

15    to his client; therefore, I believe it's not necessary.

16             How does the defendant enter a plea as to Counts 1

17    through 8 of the indictment, Mr. Proctor?

18             MR. PROCTOR:  We would enter a plea of not guilty,

19    Your Honor.

20             THE COURT:  Thank you, Mr. Proctor.

21             The Court will enter a plea of not guilty as to

22    Counts 1 through 8 of the indictment.

23             Ms. Lavigne-Rhodes, do we have another status date

24    set in this matter yet?

25             THE COURTROOM DEPUTY:  Yes, Your Honor.  A status

 1    date on February 24th at 11:00 a.m. before Judge Friedman.

 2              THE COURT:  Okay.  So you will be -- Mr. Adams,

 3    that's your district court judge in this matter, so you will

 4    not be seeing me again unless something comes up with your

 5    conditions of release.  Perhaps if your counsel wants to

 6    make -- revisit them, then he can come back to me; however,

 7    Judge Friedman is who you would appeal any decision to.

 8    Regarding that piece as well, you will have your chance to

 9    mount your defense, to think about motions to suppress,

10    whether or not, you know, there is sufficient deficiencies

11    in the indictment.  That's where you'll get to litigate your

12    case, and so you'll be before Judge Friedman on the date as

13    described very soon.

14              Mr. Edwards, anything else on your end?

15              MR. EDWARDS:  Nothing from the government.  Thank

16    you, Your Honor.

17              THE COURT:  Okay.  Thank you.

18              Mr. Proctor, anything from your end?

19              MR. PROCTOR:  Briefly, Your Honor.  Those letters

20    that Your Honor has -- I don't know that I need them to be

21    part of the public record.  I don't think there's any

22    requirement I have to file them.

23              THE COURT:  No, I'm fine just keeping them as is.

24    I'll just keep them.  I have a copy here in chambers, and

25    that's fine.  I don't think it needs to go on the record.

1    It's pretty personal stuff.

2            MR. PROCTOR:  Lastly, Your Honor, I apologize, I

3    should know the answer to this, but in the half-dozen or so

4    districts I practice it seems like the answer's different in

5    every case.

6            The federal public defender asked me to take this

7    case.  I assume my client has been qualified as indigent,

8    and I am appointed and need do nothing else, but I don't

9    know that that's true.

10           THE COURT:  Yes, that's a good question.  So as I

11   understand, you were already appointed counsel, and if

12   there's any question I am orally appointing you again as

13   counsel on this matter, and so, you know, in terms of the

14   CJA voucher, you can talk to Ms. Lavigne-Rhodes off-line.

15   She can make sure that all the paperwork is processed as

16   needed.

17           MR. PROCTOR:  Yes, sir.  Thank you.  That's all I

18   have.

19           THE COURT:  Thank you, Mr. Proctor.  Thank you for

20   your diligence and time on this.  I appreciate how

21   thoughtful you were in everything that you said and your

22   reasonableness.

23           And, Mr. Edwards, same to you.  I appreciate that.

24           Ms. Lavigne-Rhodes, anything else on your end?

25           THE COURTROOM DEPUTY:  No, Your Honor.  Thank you.

1          THE COURT:  All right.  Good luck to you,

2     Mr. Adams.  I will be here, and I'm rooting for you.  I want

3     what is best for you, and I believe that -- I'm hopeful that

4     as you go forward with your case that it will be resolved in

5     a way that's fair and just for you.  Take care.  Good luck.

6          MR. PROCTOR:  Thank you, Your Honor.

7          THE COURTROOM DEPUTY:  Thank you, everyone.

8               (Whereupon the hearing was

9                concluded at 1:00 p.m.)

10          **CERTIFICATE OF OFFICIAL COURT REPORTER**

11

12          I, LISA A. MOREIRA, RDR, CRR, do hereby

13     certify that the above and foregoing constitutes a true and

14     accurate transcript of my stenographic notes and is a full,

15     true and complete transcript of the proceedings to the best

16     of my ability.

17       **NOTE:**  This hearing was held during the COVID-19

18     pandemic stay-at-home restrictions and is subject to the

19     technological limitations of court reporting remotely.

20          Dated this 17th day of April, 2021.

21

22

23                         /s/Lisa A. Moreira, RDR, CRR
                         Official Court Reporter
24                         United States Courthouse
                         Room 6718
25                         333 Constitution Avenue, NW
                         Washington, DC 20001