IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA         *

v.                               *    Case No. 21-cr-84

DANIEL P. ADAMS                  *

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

**MEMORANDUM IN AID OF SENTENCING**

Comes now the Defendant herein, Daniel Adams, through undersigned counsel, and hereby submits this Memorandum in Aid of Sentencing:

1. Sentencing in this matter is currently set for November 29, 2023 at 10 AM.

2. Defendant entered into a Stipulated Bench Trial on July 28, 2023, and was convicted by the Court of Count 1 (Civil Disorder), Count 2 (Obstruction of an Official Proceeding), Count 3 (Assault), Count 4 (Entering and Remaining in a Restricted Building), Count 5 (Disorderly Conduct in a Restricted Building), Count 6 (Disorderly Conduct in a Capitol Building) and Count 7 (Parading).

3. Defendant was arrested on January 16, 2021 and was not released until April 9, 2021, a period of almost three (3) months. Since release, as the Presentence Report notes "defendant has complied with all Court ordered conditions of release." PSR at paragraph 19.

4. While the Presentence Report outlines the facts, there are several things to state. Firstly, Mr. Adams did not intend to hurt anyone that day. He made no attempt to cover up his face. Indeed, he wore a cap that identified the name of the company he was working for at the time. Secondly, while he did indeed commit an assault in the sense of he pushed into the USCP Officers' Riot Shields, he did not lay a hand on any officer. He was not armed with any weapon. He was struck on the head by a baton, multiple photos show blood trickling down his head. This did not cause him to strike a counter blow. Defendant was only in the Capitol for three minutes

1

and 8 seconds (3:08). This is a far cry from other January 6 participants. The entirety of Mr. Adams' time in the Capitol was spent in a break room and bathroom, trying to stem the bleeding coming from his head. The break room and bathroom are located approximately fifty (50) feet from the Senate Wing Door. Moreover, Mr. Adams while around the scaffolding of the Capitol, experienced the effects of tear gas. This was especially traumatic for him because, as narrated in the Presentence Report, he has had cataract surgery on both eyes, as well as Lasix surgery to repair scarring. PSR at paragraph 100. He has especially sensitive eyes and while tear gas pleases no-one, it was especially traumatic for Mr. Adams and caused him to act in a manner that is entirely contrary to his usual demeanor.

5. Defendant's Guideline calculation is Offense Level 22, Criminal History I, resulting in an advisory range of 37-46 months. Mr. Adams has three specific objections to the Presentence Report:

<u>Page 12, Paragraph 65:</u>

§2J1.2(b)(1)(B) applies "[i]f the offense involved causing or threatening to cause physical injury to a person, or property damage, in order to obstruct the administration of justice." The defense objects to application of the §2J1.2(b)(1)(B) enhancement in this case for a number of reasons. First, Mr. Adams did not cause or threaten to cause physical injury to a person. Mr. Adams acknowledges that he pushed past officers to go up the stairs towards the Capitol. He was unarmed throughout. But this brief moment did not involve either causing injury to any officer or threatening to cause physical injury to an officer. There is no evidence that Mr. Adams's actions caused physical injury to any person. Nor is there any evidence that Mr. Adams threatened physical injury to any officer. Pushing past officers who were standing between Mr. Adams and the Capitol was illegal, but it did not involve a threat to physically injure those officers. Compare *United States v. Wright*, No. 21-341-CKK, 2023 WL 2387816, *8 (D.D.C.

March 4, 2023) (finding threat to cause physical injury where defendant wrote posts about "fighting the blue," "we are going to drag them out," and "almost war time", picked up metal barricade and pushing into officers with it). Particularly, given that this specific offense characteristic calls for an additional 8 offense levels and would double Mr. Adams' Guideline range, an actual threat of real physical injury must be shown to warrant application of this enhancement.

Second, Mr. Adams's conduct was not aimed at "obstruct[ing] the administration of justice." Here, the reasoning of Judge McFadden in *United States v. Seefried*, 638 F.Supp.3d 8 (D.D.C. 2022) should be adopted. As Judge McFadden held, the "administration of justice" refers to a judicial or related proceeding that determines rights or obligation. The electoral certification was not such a proceeding. The defense acknowledges the D.C. Circuit's recent decision in *United States v. Robertson*, -- F.4th --, 2023 WL 6932346 (D.C. Cir. Oct. 20, 2023). However, in that case the D.C. Circuit considered the question of whether Congress' certification of the election was an "administration of justice" on plain error review and did not thoroughly examine the issue or address Judge McFadden's comprehensive decision in *Seefried*. This is because the defendant had not raised the issue at sentencing. Id. at *18. Robertson does not bind this Court on the question of whether the electoral certification involved the "administration of justice."

<u>Page 12, Paragraph 66:</u>

For the same reasons set forth in the preceding paragraph, the three-level enhancement under §2J1.2(b)(2) should not be applied. The electoral college certification did not involve the "administration of justice."

<u>Application of U.S.S.G. § 4C1.1</u>

Mr. Adams has zero criminal history points and was not engaged in a continuing criminal

3

Case 1:21-cr-00084-PLF   Document 114   Filed 11/10/23   Page 4 of 12

enterprise, he should receive a two level reduction in his offense level pursuant to § 4C1.1. For the same reasons stated above, Mr. Adams did not use violence or credible threats of violence in connection with the offense in this case. Accordingly, two (2) levels should be subtracted from the Guidelines calculation.

6. The Government, in their objection to the Presentence Report state, in relevant part that:

> In preparing for sentencing, the government has assessed that an additional enhancement for obstruction under U.S.S.G. § 3C1.1 is applicable, and should be applied to, Adams's Sentencing Guidelines calculation.
>
> The two-level upward adjustment under Section 3C1.1 is applicable to Adams's conduct aimed at obstructing the investigation of this case. Adams was arrested nine days after January 6. During that time, there was substantial national news coverage about the events of January 6. Knowing this, Adams chose to destroy evidence by taking his phone—which he had used to plan his trip to D.C., call for travelling companions, document his crimes, and boast about his conduct—and throwing it into a lake near his house. By chance, Adams, according to his custodial interview, discarded the phone the day before he was arrested. The phone was never recovered. Adams also attempted to impede the investigation by deleting his Facebook account, the forum that he had used to publicly broadcast his many offenses. By the time that Adams deleted his Facebook account, the government had already preserved it and was in the process of executing a search warrant for the contents of it. Therefore, despite Adams' efforts and unlike with the phone, the government was able to gain access to his Facebook account and review its contents. Adams admitted to the FBI during his Mirandized custodial interview that he destroyed the phone and deleted his Facebook account.
>
> Moreover, Adams repeatedly lied to the agents interviewing him during his custodial interview by claiming that he and Connell turned away from the Capitol as soon as they saw violence and never entered the building. These statements from Adams, who led the charge up the stairs, assaulted officers at the head of the mob, and entered the building within seconds of the first breach, were false. By destroying his phone, attempting to delete his Facebook account, and lying to the FBI, Adams "willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction," and "the obstructive conduct related to [Adams's] offense[s] of conviction and any relevant conduct." U.S.S.G. § 3C1.1. Therefore, a two-level increase is warranted under U.S.S.G. § 3C1.1. Because the presentence report accurately applies and calculates all of the other applicable Sentencing Guidelines, this addition increases Adams's Guidelines offense score to 27 before any reduction for acceptance of responsibility.

Defendant objects to the Court assessing this two (2) level enhancement.[1] If this is the standard, an obstruction enhancement under § 3C1.1 will be the norm, not the exception. Mr. Adams was under no obligation to leave evidence lying around for the FBI to recover it. At the time the phone was destroyed and his Facebook deleted there is nothing in the record to suggest he was aware that the FBI had personally targeted him for prosecution.[2] The undersigned has had clients who threw drugs out car windows, secreted guns in hidden compartments and disposed of ski masks used in bank robberies: none of whom faced a § 3C1.1 enhancement.

As application note 2 states "[a] defendant's denial of guilt (other than a denial of guilt under oath that constitutes perjury)...is not a basis for application of this provision." Yet the Government seems to believe that Mr. Adams stating that "he and Connell turned away from the Capitol as soon as they saw violence and never entered the building," is a bridge too far.

Support for the Defendant's position is also found in Application Note 4 which provides this Court with examples of conduct covered by this guideline provision. Application Note 4(D) states with respect to the destroying of evidence that "if such conduct occurred contemporaneously with arrest ... it shall not, standing alone, be sufficient to warrant an adjustment for obstruction unless it resulted in a material hindrance to the official investigation

---

1 It is also noteworthy that the Government tendered a plea agreement to Mr. Adams which stated that the Government would only seek an enhancement under § 3C1.1 "should your client move to withdraw your client's guilty plea after it is entered, or should it be determined by the Government that your client has either (a) engaged in conduct, **unknown to the Government at the time of the signing of this Agreement**, that constitutes obstruction of justice, or (b) engaged in additional criminal conduct after signing this Agreement." (Emphasis Supplied). Ultimately, Defendant elected to proceed by a Stipulated Trial to preserve his appellate rights, but the rationale still holds. The Government has known about the acts since January of 2021. They tendered a plea agreement and a Guidelines calculation without the § 3C1.1 enhancement. To now attempt to shoehorn an additional two (2) levels on the eve of sentencing should be given short shrift by this Court.

2 In his very first interview with law enforcement on the day of his arrest Mr. Adams told them that his cellphone "took a bath yesterday in the lake." As such, he promptly disclosed to law enforcement what had occurred and in no way attempted to conceal it. In that same interview he told the FBI that "since all this happened I shut my Facebook down."

5

or prosecution of the instant offense or the sentencing of the offender." Again, Application Note 4(G) indicates that "providing a materially false statement to a law enforcement officer that significantly obstructed or impeded the official investigation or prosecution of the instant offense" is what is required. Mr. Adams admitted to officers that he was spooked by what he was seeing on the television in relation to the January 6, 2021 occurrence, and threw his phone into a lake. While not done "contemporaneously" with his arrest, they occurred the day before the arrest. Mr. Adams later met with officers and indicated to them what kind of information was on his phone. As such, there was no "material hinderance" to the investigation and prosecution of this case.

The false statements Mr. Adams made to law enforcement cannot serve as a basis for the obstruction enhancement in this case, because they did not not "significantly obstruct or impede the official investigation." U.S.S.G. 3C1.1 cmt. nn. 4(G). See e.g. *United States v. Yaniro*, 303 F. App'x 100, 103 (3rd Cir. 2008) (rejecting the application of an obstruction of justice adjustment where "[the defendant's] false statements were largely irrelevant to the prosecution because they were quickly refuted by evidence already in the government's possession"); *United States v. Surasky*, 976 F.2d 242, 247 (5th Cir. 1992) (statement by inmate that he was not involved in escape attempt did not significantly impede the investigation when investigators already had other evidence of his guilt.). It is not enough for the Government to say that the statements were material to the government's investigation and impeded it, the Government must show a "detrimental effect upon [its] efforts to investigate or prosecute the instant offense." See *United States v. Griffin*, 310 F.3d 1017, 1023 (7th Cir. 2002).

7. The Goverment's rendition of the Guidelines is a case of the tail wagging the dog. What Mr. Adams did - - violating 18 USC § 1512(c)(2) - - carries a base offense level of fourteen (14). Obstruction as calculated by the Government, under one guise or another, carries

thirteen (13) points. If the Court were to find every enhancement requested by the Government, the bottom end of the Guidelines increases by a factor of five.

8. Should the Court agree with the objections above then the Guidelines would be as follows:

| | |
|---|---|
| Base Offense Level | 14 |
| Zero Criminal History Points | -2 |
| Acceptance | -2 |
| Final Adjusted Offense Level | 10 |

With a Criminal History Category I, this would result in a Zone B recommended sentence of 6-12 months.

9. [redacted]

10. [redacted]



11.     Attached are a panoply of sentencing letters.  Counsel has sorted them into three categories, Family, Friends and Neighbors, and Work Colleagues.  As the Court will, no doubt, read each one in its entirety, the defendant will not reiterate in any great detail what is written therein here.  That said: collectively they speak to the kind of man that Daniel Adams is.  He is an asset to his community, the entire community board took time to sign a letter extolling his virtues.  He is never one to shirk hard work.  He helps those in need, without even being asked to do so.  He coaches little league baseball, and when a hurricane hits, he helps those in need.  Many, many people rely on him, and he has never let a single one down.  In short: but for thirty (30) minutes of his life, he is someone that has lived an exemplary life and is an asset to his family, his community, and his work colleagues.

12.     Also attached as Exhibit B is the Defendant's latest paystub.  As the Court will see, in a 13 day period, between October 2 – October 15, 2023, Mr. Adams worked a total of 120 hours.  Moreover, to support his family, since his release in this case, Mr. Adams has worked as follows:

- May – September 2021 (84 hours a week) completed a welding project for Brahma in Port Authur, Texas.

- September – November 2021 (84 hours a week) project for Cust-o-fab in Artesia, New Mexico.

- November and December 2021, contracted COVID and was unable to work due to that.

- January – May 2022 (80 hours a week) contractor for ParFab in Charleston, West Virginia.

- June - July 2022, enrolled in online classes for new work certifications.

- During this same timeframe, worked 70 hours a week to finish a project in Sweeney, Texas. The project was completed in August of 2022.

- August to October 2022 (84 hours a week of night work) project for ParFab in Texas City, Texas.

- October 2022 to January 2023 worked in sales while doing side jobs for DSG Industrial Baytown, TX.

- January – February 2023 (70 hours a week) project for Applied Consulting in Pelican, Louisiana.

- March – June 2023 (60 hours a week) pipeline inspecting for System One Consulting in Keatchie, Louisiana.

- June 2023 (60 hours a week) for two weeks contractor for Applied Consulting in Many, Louisiana.

- July 31st for one week, contractor for Applied Consulting in Broken Arrow Oklahoma.

- August 2023 (70 hours a week) for 4 weeks for Applied Consulting in Odessa, Texas

- September to date (60 to 70 hours a week) Applied Consulting in Sulphur, Louisiana.

All of this evinces what just about every character letter says: that Mr. Adams works hard to provide for his family and is valued by his work colleagues and employers.

9

13. Adams' compassion and giving nature no doubt arose out of a childhood that was nothing of the sort. Mr. Adams was frequently homeless as a child. PSR at paragraph 86. ▮

▮

▮

14. Lastly, Mr. Adams' three (3) months of incarceration were especially traumatic. He suffered pretrial incarceration at COVID's very zenith. He was kept on a wing that had long since been closed, due to the influx of January 6 defendants. He was held in relative isolation in C2A and C2B of the Correctional Treatment Facility. Initially, there was black mold on the wall of his cell, which Defendant endeavored to clean during the one (1) hour per day that he was allowed to leave his cell. He had no access to the law library. He was not supplied any razor and was forced to burn his facial hair off with Nair. The only tap from which Defendant could get water to hydrate and wash previously had some sort of a moldy type substance coming out of it. Defendant typically attached a sock to the tap before filling up his water bottle, in a bid to filter out impurities. At one point, he placed a sick call for nine (9) consecutive days, before he was seen by medical. During some periods of his incarceration he slept on the floor because, when he lying in bed, he was often soaked by the dripping coming from the walls. Literally the only in-person jail visit which the undersigned had during 2021 was Mr. Adams, because of the especially punitive conditions under which he was held. This is, in and of itself, a reason to depart from the Guidelines.

15. As this sentencing memo discusses Mr. Adams' personal circumstances, ▮ ▮ counsel requests permission to file it under seal. It is, of course, entirely appropriate that Government counsel review it, and counsel will email it to them contemporaneously with filing.

16. A former Judge that the undersigned frequently appeared in front of was fond of saying that "the problem with the Guidelines is that they turn lawyers into accountants." That is precisely the problem here. Mr. Adams for all but a few moments, has lived an exemplary life. He needs zero specific deterrence. He has learned from this experience and is not the same person that charged up the steps that day. His post arrest rehabilitation is complete. This Court should department from the Guidelines which are excessively punitive and greater than the sentence Mr. Adams' personal circumstances merit.

WHEREFORE, Defendant respectfully requests that this Honorable Court vary from the Guidelines and impose a sentence that comports with the strictures of § 3553(a).

Respectfully Submitted,

/s/
Gary E. Proctor
Bar Roll Number MD27936
Law Offices of Gary E. Proctor, LLC
8 E. Mulberry Street
Baltimore, Maryland 21202
Tel:    410.444.1500
Fax:    443.836.9162

**CERTIFICATE OF SERVICE**

I hereby certify that on this day, November 9, 2023, a copy of the foregoing was filed under seal, which will not cause it to be served on opposing counsel. However, as stated above, the undersigned will email it to Government counsel contemporaneously with its filing.

/s/

11

Gary E. Proctor