**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

UNITED STATES OF AMERICA        *

v.                              *   Case No.  21-cr-84

DANIEL P. ADAMS                 *

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

**MEMORANDUM IN AID OF SENTENCING**

Comes now the Defendant herein, Daniel Adams, through undersigned counsel, and hereby submits this Memorandum in Aid of Sentencing:

INTRODUCTION

Sentencing in this matter is currently set for December 10, 2024 at 10 AM.  Defendant entered into a Stipulated Bench Trial on July 28, 2023, and was convicted by the Court of Count 1 (Civil Disorder), Count 2 (Obstruction of an Official Proceeding), Count 3 (Assault), Count 4 (Entering and Remaining in a Restricted Building), Count 5 (Disorderly Conduct in a Restricted Building), Count 6 (Disorderly Conduct in a Capitol Building) and Count 7 (Parading).  In ECF 147 this Court set aside Mr. Adams' conviction with regard to Count 2.

Defendant was arrested on January 16, 2021 and was not released until April 9, 2021, a period of almost three (3) months.  In the more than three and a half years since release, as the Presentence Report notes "defendant has complied with all Court ordered conditions of release." PSR at paragraph 19.

While the Presentence Report outlines the facts, there are several things to state.  Firstly, Mr. Adams did not intend to hurt anyone that day.  He made no attempt to cover up his face.  Indeed, he wore a cap that identified the name of the company he was working for at the time.  Secondly, while he did indeed commit an assault in the sense of he pushed into the USCP Officers' Riot

1

Shields, he did not lay a hand on any officer. He was not armed with any weapon. He was struck on the head by a baton, multiple photos show blood trickling down his head. This did not cause him to strike a counter blow. Defendant was only in the Capitol for three minutes and 8 seconds (3:08). This is a far cry from other January 6 participants. The entirety of Mr. Adams' time in the Capitol was spent in a break room and bathroom, trying to stem the bleeding coming from his head. The break room and bathroom are located approximately fifty (50) feet from the Senate Wing Door. Moreover, Mr. Adams while around the scaffolding of the Capitol, experienced the effects of tear gas. This was especially traumatic for him because, as narrated in the Presentence Report, he has had cataract surgery on both eyes, as well as Lasix surgery to repair scarring. PSR at paragraph 100. He has especially sensitive eyes and while tear gas pleases no-one, it was especially traumatic for Mr. Adams and caused him to act in a manner that is entirely contrary to his usual demeanor.

### OBJECTIONS TO THE PRESENTENCE REPORT

Mr. Adams has the following objections to the Presentence Report:

[I]   Obstruction

The Presentence Report assesses two (2) levels for Obstruction. See PSR at paragraph 69. This is presumably based on a submission by Government counsel, in their objection to the Presentence Report which stated, in relevant part that:

> In preparing for sentencing, the government has assessed that an additional enhancement for obstruction under U.S.S.G. § 3C1.1 is applicable, and should be applied to, Adams's Sentencing Guidelines calculation.
>
> The two-level upward adjustment under Section 3C1.1 is applicable to Adams's conduct aimed at obstructing the investigation of this case. Adams was arrested nine days after January 6. During that time, there was substantial national news coverage about the events of January 6. Knowing this, Adams chose to destroy evidence by taking his phone—which he had used to plan his trip to D.C., call for travelling companions, document his crimes, and boast about his conduct—and throwing it into a lake near his house. By chance, Adams, according to his custodial interview, discarded the phone the day before he was arrested. The phone was never

recovered. Adams also attempted to impede the investigation by deleting his Facebook account, the forum that he had used to publicly broadcast his many offenses. By the time that Adams deleted his Facebook account, the government had already preserved it and was in the process of executing a search warrant for the contents of it. Therefore, despite Adams' efforts and unlike with the phone, the government was able to gain access to his Facebook account and review its contents. Adams admitted to the FBI during his Mirandized custodial interview that he destroyed the phone and deleted his Facebook account.

Moreover, Adams repeatedly lied to the agents interviewing him during his custodial interview by claiming that he and Connell turned away from the Capitol as soon as they saw violence and never entered the building. These statements from Adams, who led the charge up the stairs, assaulted officers at the head of the mob, and entered the building within seconds of the first breach, were false. By destroying his phone, attempting to delete his Facebook account, and lying to the FBI, Adams "willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction," and "the obstructive conduct related to [Adams's] offense[s] of conviction and any relevant conduct." U.S.S.G. § 3C1.1. Therefore, a two-level increase is warranted under U.S.S.G. § 3C1.1. Because the presentence report accurately applies and calculates all of the other applicable Sentencing Guidelines, this addition increases Adams's Guidelines offense score to 27 before any reduction for acceptance of responsibility.

Defendant objects to the Court assessing this two (2) level enhancement.[1]  If this is the standard, an obstruction enhancement under § 3C1.1 will be the norm, not the exception.  Mr. Adams was under no obligation to leave evidence lying around for the FBI to recover it.  At the time the phone was destroyed and his Facebook deleted there is nothing in the record to suggest he was aware that

---

[1]     It is also noteworthy that the Government tendered a plea agreement to Mr. Adams which stated that the Government would only seek an enhancement under § 3C1.1 "should your client move to withdraw your client's guilty plea after it is entered, or should it be determined by the Government that your client has either (a) engaged in conduct, **unknown to the Government at the time of the signing of this Agreement**, that constitutes obstruction of justice, or (b) engaged in additional criminal conduct after signing this Agreement." (Emphasis Supplied).  Ultimately, Defendant elected to proceed by a Stipulated Trial to preserve his appellate rights, but the rationale still holds.  The Government has known about the acts since January of 2021.  They tendered a plea agreement and a Guidelines calculation without the § 3C1.1 enhancement.  To now attempt to shoehorn an additional two (2) levels  should be given short shrift by this Court.

the FBI had personally targeted him for prosecution.[2]  The undersigned has had clients who threw drugs out car windows, secreted guns in hidden compartments and disposed of ski masks used in bank robberies: none of whom faced a § 3C1.1 enhancement.

As application note 2 states "[a] defendant's denial of guilt (other than a denial of guilt under oath that constitutes perjury)...is not a basis for application of this provision."  Yet the Government seems to believe that Mr. Adams stating that "he and Connell turned away from the Capitol as soon as they saw violence and never entered the building," is a bridge too far.

Support for the Defendant's position is also found in Application Note 4 which provides this Court with examples of conduct covered by this guideline provision. Application Note 4(D) states with respect to the destroying of evidence that "if such conduct occurred contemporaneously with arrest ... it shall not, standing alone, be sufficient to warrant an adjustment for obstruction unless it resulted in a material hindrance to the official investigation or prosecution of the instant offense or the sentencing of the offender." Again, Application Note 4(G) indicates that "providing a materially false statement to a law enforcement officer that significantly obstructed or impeded the official investigation or prosecution of the instant offense" is what is required.  Mr. Adams admitted to officers that he was spooked by what he was seeing on the television in relation to the January 6, 2021 occurrence, and threw his phone into a lake.  While not done "contemporaneously" with his arrest, they occurred the day before the arrest. Mr. Adams later met with officers and indicated to them what kind of information was on his phone. As such, there was no "material hinderance" to the investigation and prosecution of this case.

---

[2]   In his very first interview with law enforcement on the day of his arrest Mr. Adams told them that his cellphone "took a bath yesterday in the lake."  As such, he promptly disclosed to law enforcement what had occurred and in no way attempted to conceal it.  In that same interview he told the FBI that "since all this happened I shut my Facebook down."

The false statements Mr. Adams made to law enforcement cannot serve as a basis for the obstruction enhancement in this case, because they did not "significantly obstruct or impede the official investigation." U.S.S.G. 3C1.1 cmt. n. 4(G). See e.g. *United States v. Yaniro*, 303 F. App'x 100, 103 (3rd Cir. 2008) (rejecting the application of an obstruction of justice adjustment where "[the defendant's] false statements were largely irrelevant to the prosecution because they were quickly refuted by evidence already in the government's possession"); *United States v. Surasky*, 976 F.2d 242, 247 (5th Cir. 1992) (statement by inmate that he was not involved in escape attempt did not significantly impede the investigation when investigators already had other evidence of his guilt.). It is not enough for the Government to say that the statements were material to the government's investigation and impeded it, the Government must show a "detrimental effect upon [its] efforts to investigate or prosecute the instant offense." See *United States v. Griffin*, 310 F.3d 1017, 1023 (7th Cir. 2002).

[II]   Application of Aggravated Assault Guideline

The PSR applies the aggravated assault guideline.[3] Mr. Adams maintains that the appropriate guideline is 2A2.4 as this was not an aggravated assault as defined by the sentencing guidelines. USSG § 2A2.4(c) only notes that a defendant convicted of assaulting a federal officer under 18 U.S.C. § 111 should be sentenced under §2A2.2 if the defendant's conduct constituted aggravated assault. Adams' conduct did not constitute aggravated assault.[4] The commentary to the

---

[3]   Mr. Adams concedes that the D.C. Circuit has ruled against the defense on this issue in two separate cases, *United States v. Sargent*, 2024 WL 2873106 (D.C. Cir. June 7, 2024) and *United States v. Stevens*, 2024 WL 3211587 (D.C. Cir. June 28, 2024) but raises this issue to preserve it.

[4]   "Aggravated Assault" is defined in §2A2.2 application note 1. See *United States v. Hooker*, 997 F.2d 67, 39 Fed. R. Evid. Serv. 443 (5th Cir. 1993) (pointing a cocked and loaded firearm at the victim's head, while kicking him and deciding where to kill him, constitutes aggravated assault as to trigger §2A2.2)

5

aggravated assault guideline defines aggravated assault as "a felonious assault that involved (A) a dangerous weapon with intent to cause bodily injury (i.e., not merely to frighten) with that weapon; (B) serious bodily injury; (C) strangling, suffocating, or attempting to strangle or suffocate; or (D) an intent to commit another felony. Cmt." This does not apply to Mr. Adams' conduct.

[III] Official Victim

Mr. Adams objects to the inclusion of a 6-level enhancement under U.S.S.G § 3A1.2 because the victim was a government official. See Presentence Report at para 67. Even if the Court applies the enhancement, consideration of a variance is appropriate because that enhancement typically applies when there is an animus towards a government official. Mr. Adams was not predisposed to be motivated by the officer's status. The applicable guideline provides in full:

(Apply the greatest):

(a) If (1) the victim was (A) a government officer or employee; (B) a former government officer or employee; or (C) a member of the immediate family of a person described in subdivision (A) or (B); and (2) the offense of conviction was motivated by such status, increase by 3 levels;

(b) If subsection (a)(1) and (2) apply, and the applicable Chapter Two guideline is from Chapter Two, Part A (Offense Against the Person), increase by 6 levels.

(c) If, in a manner creating a substantial risk of serious bodily injury, the defendant or a person for whose conduct the defendant is otherwise accountable –
(1) knowing or having reasonable cause to believe that a person was a law enforcement officer, assaulted such officer during the course of the offense or immediate flight therefrom; or

(2) knowing or having reasonable cause to believe that a person was a prison official, assaulted such official while the defendant (or a person for whose conduct the defendant is otherwise accountable) was in the custody or control of a prison or other correctional facility, increase by 6 levels.

U.S.S.G § 3A1.2.

6

In the commentary, the Commission explains in pertinent part that "motivated by such status," means that the offense of conviction was motivated by the fact that the victim was a government officer or employee. *Id*. cmt. n.3. The Commission goes on to provide an example "where both the defendant and the victim were employed by the same government agency and the offense was motivated by a personal dispute." *Id.* A 6-level increase would be dramatic, and its application in this case would over emphasize the importance of the victim's status in the actions taken.

[IV]   Zero Criminal History Points

Mr. Adams has zero criminal history points and was not engaged in a continuing criminal enterprise, he should receive a two level reduction in his offense level pursuant to § 4C1.1. For the same reasons stated above, Mr. Adams did not use violence or credible threats of violence in connection with the offense in this case. Accordingly, two (2) levels should be subtracted from the Guidelines calculation. The Sentencing Guidelines Manual itself does not define the term "use violence or credible threats of violence" within § 4C1.1 or its commentary. And when no definitions are provided, courts look to dictionary definitions to determine meaning. See *Kaufman v. Nielsen*, 896 F.3d 475, 485-87 (D.C. Cir. 2018). Courts in this district
have issued several opinions discussing dictionary definitions of violence when considering § 4C1.1 and found that violence is "'[t]he use of physical force, typically 'accompanied by fury, vehemence, or outrage,' and 'unlawfully exercised with the intent to harm'" or the "exertion of any physical force so as to injure or abuse." *Bauer*, 2024 WL 324234, at *2 (quoting Violence, Black's Law Dictionary (11th ed. 2019), and Violence, Webster's Third New International Dictionary (1993)); see also *United States v. Yang*, No. 23-cr-100 (JDB), 2024 WL 519962, at *4 (D.D.C. Feb. 9, 2024) (similar); *United States v. Hernandez*, No. 21-cr-445 (CKK), ECF No. 65 at

7

5 (D.D.C. Jan. 31, 2024) (similar).

Courts in this District to have addressed the issue have found that §4C1.1(a)(3)'s violence exception requires the defendant to have personally used violence or made credible threats of violence to be disqualified; it is simply not enough that Mr. Adams was part of a group where others engaged in violence or made credible threats of violence. See, e.g., *Yang*, 2024 WL 519962, at *4 (rejecting the government's violence-by-presence theory of § 4C1.1(a)(3) after finding the "inquiry turns on the actions of the defendant himself or herself, not the actions of others," and "join[ing] the view of at least six other judges in this District," including Judges Kollar-Kotelly, McFadden, Friedrich, Mehta, Howell, and Boasberg). See also, *United States v. Joshua Doolin*, 21-CR-447-3 (CJN) Dkt. 313 (adding Judge Nichols to the list of judges who concur); *United States v. Paul Orta*, 24-cr-146 (DLF); *United States v. Fuller*, 23-cr-209-03 (CKK), Dkt 89.

Judge Bates' written opinion in *Yang* is instructive. There, Mr. Yang "stood near the front of the crowd close to the police line" in the Rotunda. *Yang*, 2024 WL 519962, at *1. While Mr. Yang's "body language was generally nonconfrontational," he made "physical contact with officers twice." *Id*. First, "[w]hen a scuffle broke out nearby . . . Yang briefly grabbed an officer's wrist." *Id.* Second, "[w]hen an officer approached from the side and pushed [another rioter] firmly with a baton, Yang . . . briefly grabbed the baton as [the other rioter] fell backward." *Id.*[5] The

---

[5] According to the government's sentencing memorandum, "When police officers formed a line to expel the rioters from the Rotunda, Yang refused to move back or to leave, and instead, obstructed the officers. Yang pushed back and physically grabbed the arm of one officer, and when another officer pushed Yang towards the exit, Yang confronted the officer and waved his hand in his face instead of leaving. He remained near the advancing police line, and when an officer used his baton to push another rioter back, Yang physically grabbed hold of that officer's baton and interfered with the officer's attempt to clear the Rotunda. Yang finally exited the U.S. Capitol building at approximately 3:15 p.m., having been inside for roughly 30 minutes." *Yang*, No. 23-cr-100, ECF No. 34 at 2.

8

government further represented that Mr. Yang "push[ed] back against the officers" and "remained at the front of the mob clashing with the officers," *Id.* at 12.

Judge Bates concluded that Mr. Yang's actions did not constitute "violence" within the meaning of § 4C1.1. *Yang*, 2024 WL 519962, at *4. Yang "stood near the front of the crowd close to the police line. While his body language was generally nonconfrontational, he made physical contact with officers twice." He grabbed a police officer's wrist and grabbed the baton of an officer as he was pushing another rioter away. The Court found that while Mr. Yang may have used physical force in that "he briefly made physical contact with two officers, the Court [found] that this contact was not made with an intent to harm." *Id.* As the Court explained, "[t]he throughline of the definitions of 'violence' is a degree of aggressiveness that [wa]s not present in th[at] case." *Id.* And, even though Mr. Yang was "near the front of the line opposing the line of officers," and twice made physical contact with officers, the Court concluded that "Yang did not act with the degree of aggression necessary to fairly characterize his actions as 'violence.'" *Id.*

Similarly, in *Orta*, the government conceded that the *Yang* standard was appropriate, but argued 4C1.1 did not apply because of two incidents – one, his pushing of the metal bicycle barricade against officers and second, his subsequent throwing of a Go-Pro or body worn camera at officers.[6] The Court ruled against the government and applied 4C1.1.

> You can have the intent to impede and get around, but not necessarily the intent to hurt. And I don't know if just the natural and probable consequence of pushing on a barricade could cause injury is enough, whether you have to show the specific intent, I think, here to injure. . . So I do think that . . . there's got to be more than just aggression. It's got to be aggression plus a specific intent to injure. . . . I don't know that simply saying that you're pushing against a barricade and that's a dangerous object that could injure is enough.

---

[6] The Court referred to the definition of violence as "the use of physical force typically accompanied by fury, vehemence, or outrage and unlawfully exercised with the intent to harm, also defined as the exertion of any physical force so as to injure or abuse." The government conceded this definition was appropriate.

9

Tr. at 34-36.

And this was the finding despite the fact that the Court specifically found that in that case there was "great aggression, great fury, great outrage, great physical force," and a throwing of an object. Even if the Court believes that 4C1.1 does not apply, the rationale that underlies the provision supports a variance. The provision was enacted because significant research finds that zero-point offenders are unlikely to recidivate. The same applies in this case because of Mr. Adams' history and characteristics, despite the actions the Court found Mr. Adams took.

[V]    Multi Count Adjustment

Lastly, Mr. Adams objects to the Multi Count Adjustment, see PSR at para 70. The PSR incorrectly applies a one-level increase under USSG § 3D1.4, contending that Count 1 (Civil Disorder and Aiding and Abetting) involved a different victim than the other counts. Count 1 broadly charges Mr. Connell with obstructing officers. There was no one individual "victim" identified in the charging documents or at trial. Therefore, all the counts group as "two or more acts connected by a common criminal scheme." USSG §3D1.2(b). Moreover, section 231(a)(3) "any act" that obstructs, impedes, or interferes with an officer performing lawful duties "incident to and during the commission of a civil disorder." The acts are Mr. Adams' acts inside the Capitol. The various counts arise from the same specific acts, share the same victims, are temporally related, and therefore must be grouped pursuant to U.S.S.G. §3D1.2.

Should the Court agree with the objections above then the Guidelines would be as follows:

| | |
|---|---|
| Base Offense Level  2A2.4 | 10 |
| The Offense involved physical Contact 2A2.4(b)(1) | +3 |
| Zero Point Offender | -2 |

    Acceptance                                     <u>-2</u>

    Final Adjusted Offense Level           <u>9</u>

With a Criminal History Category I, this would result in a Zone B recommended sentence of 4-10 months.

[redacted]

███████████████████████████████████████████████
████

███████████████████████████████████████  ███████████████

█████████.

PERSONAL CHARACTERISTICS OF DANIEL ADAMS

Attached are a panoply of sentencing letters.  Counsel has sorted them into three categories, Family, Friends and Neighbors, and Work Colleagues.  As the Court will, no doubt, read each one in its entirety, the defendant will not reiterate in any great detail what is written therein here.  That said: collectively they speak to the kind of man that Daniel Adams is.  He is an asset to his community, the entire community board took time to sign a letter extolling his virtues.  He is never one to shirk hard work.  He helps those in need, without even being asked to do so.  He coaches little league baseball, and when a hurricane hits, he helps those in need.  Many, many people rely on him, and he has never let a single one down.  In short: but for thirty (30) minutes of his life, he is someone that has lived an exemplary life and is an asset to his family, his community, and his work colleagues.

Also attached as Exhibit B is one of the Defendant's paystubs.  As the Court will see, in a 13 day period, between October 2 – October 15, 2023, Mr. Adams worked a total of 120 hours.  In Adams' most recent paystub from November 15, 2024 he also worked 120 hours.  Adams is not afraid of hard work.  Moreover, to support his family, since his release in this case, Mr. Adams has worked as follows:

- May – September 2021 (84 hours a week) completed a welding project for Brahma in Port Authur, Texas.

- September – November 2021 (84 hours a week) project for Cust-o-fab in Artesia, New Mexico.

- November and December 2021, contracted COVID and was unable to work due to that.

- January – May 2022 (80 hours a week) contractor for ParFab in Charleston, West Virginia.

- June - July 2022, enrolled in online classes for new work certifications.

- During this same timeframe, worked 70 hours a week to finish a project in Sweeney, Texas. The project was completed in August of 2022.

- August to October 2022 (84 hours a week of night work) project for ParFab in Texas City, Texas.

- October 2022 to January 2023 worked in sales while doing side jobs for DSG Industrial Baytown, TX.

- January – February 2023 (70 hours a week) project for Applied Consulting in Pelican, Louisiana.

- March – June 2023 (60 hours a week) pipeline inspecting for System One Consulting in Keatchie, Louisiana.

- June 2023 (60 hours a week) for two weeks contractor for Applied Consulting in Many, Louisiana.

- July 31st for one week, contractor for Applied Consulting in Broken Arrow Oklahoma.

- August 2023 (70 hours a week) for 4 weeks for Applied Consulting in Odessa, Texas.

- September to November 2023 (60 to 70 hours a week) Applied Consulting in Sulphur, Louisiana.

- November 2023 to date Mr. Adams continues to work for Applied Consulting. He is overseeing fabrication of compressors that turn natural gas into liquid natural gas. While based in Houston, Texas he is also involved in overseeing piping systems headed to Carlsbad, New Mexico and compressors shipped to North Dakota.

All of this evinces what just about every character letter says: that Mr. Adams works hard to provide for his family and is valued by his work colleagues and employers.

Adams' compassion and giving nature no doubt arose out of a childhood that was nothing of the sort. Mr. Adams was frequently homeless as a child. PSR at paragraph 86. ██████████████████████████████████████████████████████████ When he saw his children being mistreated by their mother he applied for and was granted custody. PSR at para. 90.

More recently, Mr. Adams health has begun to decline. At the time of sentencing counsel will be requesting that the Presentence Report be amended to note the following up to date list of medications: Nifedipine 60 MG daily (for high blood pressure), Hydrochlorothiazide 25MG daily(treatment for Meniere's disease, ears), Hearing aids (which require being charged nightly), Testosterone CYP 200MG (weekly), and Anastrozole 1 MG per week as well as over the counter small dose aspirin.

As referenced above Mr. Adams now suffers from hearing loss, and constant ringing in his ears. He has been diagnosed with Meniere's disease. See, further, https://www.nidcd.nih.gov/health/menieres-disease#5 (last visited November 27, 2024). This will be difficult to treat in the Bureau of Prisons.

Lastly, Mr. Adams' three (3) months of incarceration were especially traumatic. He suffered pretrial incarceration at COVID's very zenith. He was kept on a wing that had long since been closed, due to the influx of January 6 defendants. He was held in relative isolation in C2A and C2B of the Correctional Treatment Facility. Initially, there was black mold on the wall of his cell, which Defendant endeavored to clean during the one (1) hour per day that he was allowed to leave his cell. He had no access to the law library. He was not supplied any razor and was forced to burn his facial hair off with Nair. The only tap from which Defendant could get water to hydrate

and wash previously had some sort of a moldy type substance coming out of it. Defendant typically attached a sock to the tap before filling up his water bottle, in a bid to filter out impurities. At one point, he placed a sick call for nine (9) consecutive days, before he was seen by medical. During some periods of his incarceration he slept on the floor because, when he lying in bed, he was often soaked by the dripping coming from the walls. Literally the only in-person jail visit which the undersigned had during 2021 was Mr. Adams, because of the especially punitive conditions under which he was held. This is, in and of itself, a reason to depart from the Guidelines.

## CONCLUSION

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

A former Judge that the undersigned frequently appeared in front of was fond of saying that "the problem with the Guidelines is that they turn lawyers into accountants." That is precisely the problem here. Mr. Adams for all but a few moments, has lived an exemplary life. He needs zero specific deterrence. He has learned from this experience and is not the same person that charged up the steps that day. His post arrest rehabilitation is complete. This Court should department from the Guidelines which are excessively punitive and greater than the sentence Mr. Adams' personal circumstances merit.

WHEREFORE, Defendant respectfully requests that this Honorable Court vary from the Guidelines and impose a sentence that comports with the strictures of § 3553(a).

Respectfully Submitted,

_____/s/_____
Gary E. Proctor
Bar Roll Number MD27936
Law Offices of Gary E. Proctor, LLC
233 E. Redwood Street, Suite 1000C
Baltimore, Maryland 21202
Tel:    410.444.1500
Fax:    443.836.9162

**CERTIFICATE OF SERVICE**

I hereby certify that on this day, November 27, 2024, a copy of the foregoing was filed on all parties via ECF.

_____/s/_____
Gary E. Proctor